2023 IL App (1st) 191699

FIRST DISTRICT
SECOND DIVISION
June 27, 2023

No. 1-19-1699

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 0059 |
| | ) | |
| ANTHONY MRDJENOVICH, | ) | Honorable |
| | ) | Marc R. Martin, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1     A jury convicted defendant Anthony Mrdjenovich of the first degree murder of Phillip Scheau. On appeal, defendant argues that his confession should have been suppressed on fourth- and fifth-amendment grounds; that the trial court denied him his due-process right to present a defense by limiting his ability to elicit evidence of the circumstances of his confession and the fact that he was a "victim" of "human trafficking;" and that his prior conviction, for aggravated robbery, should not have been admitted as impeachment evidence. We affirm.

¶ 2                                    BACKGROUND

¶ 3                                         I

¶ 4     Phillip Scheau was shot and killed in front of a Motel 6 in Schiller Park on February 27, 2015. A few months later, defendant told the police and a grand jury that one Timothy Dorsey was the shooter. Defendant later admitted that he lied about Dorsey and confessed that *he* was the shooter—only to recant his confession at trial and pin the shooting on a man named Rob

Funteas. But no matter whom defendant named as the actual shooter in any given account, the driving force behind Scheau's murder, as defendant would have it, has always been Dorsey.

¶ 5    Dorsey has not been charged as a codefendant, and his culpability for the murder, if any, is not at issue. Still, it was Dorsey's "sex-trafficking ring" that set the stage for the tragic events that gave rise to this case. *United States v. Dorsey*, 830 F. App'x. 479 (7th Cir. 2020) (nonprecedential disposition); see 18 U.S.C. § 2421 (2018). To put Scheau's murder, the investigation, and defendant's conflicting statements into their full context, we thus begin with a brief introduction to Dorsey and the sordid criminal enterprise that has since landed him in federal prison.

¶ 6    When Scheau was murdered, the FBI and local law-enforcement agencies were already investigating Dorsey's operation. Briefly, based in the Chicago area, Dorsey would send his "masseurs" throughout the country to offer "massage" services—which often included sexual acts—to customers who booked appointments through Dorsey on the Internet site Backpage. Dorsey would set the terms of the appointments, arrange transportation, and generally collect half the proceeds. Dorsey's workers typically were young men in desperate financial straits. On many accounts, Dorsey sought to maintain their fealty through manipulation, abuse, and threats of violence.

¶ 7    Scheau was—or had been—one of Dorsey's "masseurs." He had recently quit Dorsey's operation and began posting ads on Backpage for his own independent services. In short order, he turned up dead at the Motel 6, where he had booked an appointment with a customer. Or so he thought. It did not take long for the authorities to suspect that his murder was related to Dorsey's operation. But details, and proof, were initially hard to come by. The shooter left behind little in the way of eyewitnesses or other actionable evidence.

¶ 8                                                    II

¶ 9     Perhaps the first major development in the investigation came in August 2015, when defendant contacted Scheau's sister Anna on Facebook. Defendant, then 19 years old, was also one of Dorsey's "masseurs," based out of Dallas, Texas. He said he had information about the murder that he would share with the police in exchange for a "reward" and "protection" from Dorsey. Though they could make no promises at that time, the Schiller Park detectives leading the investigation, Frank DiSimone and Brian Norris, were of course eager to hear what defendant had to say. In mid-September, defendant agreed to come back to the Chicago area and meet with the detectives at a local restaurant, where he conveyed his first version of the events.

¶ 10    In sum, Dorsey was furious when he found Scheau's ads. Dorsey told defendant that he shot Scheau in the back and head, with a .380-caliber handgun, at a fake appointment that he had booked. Defendant said he was in Texas at the time of the murder. The day after he first met with the detectives, defendant testified to these same facts before a grand jury.

¶ 11    Having no roots in the Chicago area, defendant immediately left town and was pulled over for speeding in Michigan. He was driving a rental car provided by Dorsey, who routinely dispatched his workers to their far-flung appointments in rental cars and on buses. Unbeknownst to defendant, the car had recently been reported stolen. Defendant was arrested, quickly accepted a plea deal, and spent 90 days in a Michigan county jail.

¶ 12    Detectives Norris and DiSimone visited defendant in jail in mid-November 2015. (The video recording of their conversation is included in the record.) They urged him to return to the Chicago area when he was released, where he could best help the detectives achieve everyone's common goal: to "put [Dorsey] away." The detectives, in turn, could help defendant get his life in order. And not just for his own sake: this would also make him a far more credible witness in

a case against Dorsey. But this mutual advantage would only pan out if defendant remained close by and in regular contact with the detectives.

¶ 13    Defendant was receptive to the idea. Perhaps it helped that Dorsey, as the detectives told him, was now in custody in Georgia (on a state-law pimping charge; his federal indictments would come over a year later, in 2017). Defendant told the detectives that he did have one friend in Chicago, someone named Freddie, with whom he hoped to stay.

¶ 14    After meeting with defendant, DiSimone went to Texas, where, among other things, he spoke to defendant's adoptive parents. DiSimone told them that he and Norris wanted to help defendant, whom they viewed as a likely victim of Dorsey's sex-trafficking operation as well as a key witness in the murder. By the time defendant was released, his parents had purchased a bus ticket for him to return to the Chicago area.

¶ 15    While he was in Texas, DiSimone interviewed Ben Price and J.C. LaSoya, two more of Dorsey's "masseurs." And the investigation took a new turn: Price put defendant at the murder scene with Dorsey. Specifically, according to Price, defendant told Price that he drove up from Dallas, with Dorsey, and saw an unnamed third person—a "hired gunman"—walk up to the Motel 6. (Granted, Price's account was hearsay, but so was defendant's.) Price claimed he did not know who the victim was and thought that the murder happened in Chicago.

¶ 16                                      III

¶ 17    Defendant was soon released, in early December 2015, and returned to the Chicago area as planned. Given his recent history of flight and general rootlessness, the detectives were not about to let him disappear into the wild before they had a chance to confront him with Price's statement. So they met him at the bus station and drove him directly to the Schiller Park police station for questioning.

¶ 18    Detectives Norris and DiSimone interviewed defendant on December 3, and then again on December 4. In due course, he would move to suppress these statements on fourth- and fifth-amendment grounds. The trial court granted in part the fifth-amendment motion based on *Miranda v. Arizona*, 384 U.S. 436 (1966), though the ruling did not result in the suppression of any significant statements. We will return to these rulings and the pertinent details of the questioning later, as they become relevant to the issues before us. For now, it is the evolving content of defendant's statements that matters.

¶ 19    At the outset of the December 3 questioning, the detectives confronted defendant with the fact that "some other people" were putting him in the Chicago area, with Dorsey, at the time of the murder. Defendant initially denied these allegations and stuck to his story: he was in Dallas.

¶ 20    About 20 minutes in, defendant admitted, for the first time, that he drove from Dallas to Chicago with Dorsey. In other words, he had lied to the police and the grand jury. But he did not yet admit that he was at the Motel 6. Rather, he said, the two drove to Dorsey's apartment in Elk Grove Village, where Dorsey picked up a gun. Dorsey left defendant at the apartment, sometime around midnight. (Scheau was shot shortly before 10 p.m.) When Dorsey returned, it was "late as hell," and they left immediately. All in all, defendant maintained, he "was pretty much there to help drive" from Dallas and back.

¶ 21    When Dorsey returned from the Motel 6, he allegedly told defendant that he had just killed Scheau: at the fake appointment, he ran up behind Scheau; the gun jammed, so he fired again, shooting Scheau in the back; Scheau ran around the corner of the motel; and Dorsey chased him, and fired again, this time shooting him in the head.

¶ 22    The detectives grew suspicious that truly second-hand information would be this detailed, not to mention consistent with the presence of live rounds found at the scene, suggesting that the

gun had in fact jammed. And some glaring discrepancies remained between Price's statement and defendant's newly revised account. For one, DiSimone had been told that at least two, and perhaps as many as three, people were at the scene of the murder. Even more importantly, as he reminded defendant, "[p]eople are telling me you were there."

¶ 23    Pressed by the detectives, defendant's story slowly morphed into a new one: Dorsey had defendant drop him off at an intersection adjacent to the Motel 6, near a car wash, a Dunkin Donuts, and some other businesses. Dorsey then asked defendant to wait for him at another Dunkin Donuts, several (perhaps as many as 15) minutes away by car, where Dorsey would later take a cab to meet him.

¶ 24    The detectives balked at that last detail. To foreshadow an issue to come, they told defendant that they still hoped to present him to the assistant state's attorney as a "victim" of Dorsey's "human trafficking" business, and thus as someone who should not be treated as an "offender" in this case, no matter what his involvement in Scheau's murder may have been. (No promises, though, Detective Norris clarified.) But they could only hope to win over the prosecutor if defendant told them the whole, unvarnished truth. Stories that do not make sense are rarely that. And defendant's latest story "fell apart" at the end: if Dorsey pressed defendant into service as his driver, why would Dorsey have him wait miles away, at a random Dunkin Donuts, after dropping him at the Motel 6, only to have to hail a cab from the murder scene back to the getaway car?

¶ 25    Defendant grew mountingly nervous and, as the trial court found, invoked his right to remain silent. The questioning did not promptly end, and we will return to that point later. But suffice it to say, for now, that defendant did not incriminate himself any further on December 3. He spent the night in a holding cell, and on the morning of December 4, in the trial court's view,

he voluntarily reinitiated the conversation with the detectives.

¶ 26    Unlike the December 3 questioning, the video recording of the December 4 confession was not included in the record on appeal. (Nor was the transcript of either day.) But the substance of his statement was conveyed though testimony at the suppression hearing and at trial, and there is no apparent dispute about what defendant said to the detectives on December 4. In the last of his pretrial accounts of Scheau's murder, defendant now confessed that he was the shooter. That confession would become the centerpiece of the State's case at trial.

¶ 27                                      IV

¶ 28    Because the sufficiency of the evidence is not challenged, and much of the trial testimony was not directly relevant to the issues before us, a brief overview of the parties' theories and key evidence will suffice.

¶ 29    The State's theory was simple: defendant shot and killed Scheau. We know that because he confessed. And whatever he might say about Dorsey is not a defense to first degree murder.

¶ 30    Defendant took the stand, recanted his confession, and testified that Rob Funteas killed Scheau at Dorsey's behest. Defendant was roped into it all by Dorsey, but only to help drive from Texas to Chicago. The jury was instructed on principal liability only; neither party asked for an accountability instruction.

¶ 31    There was little in the way of crime-scene evidence or eyewitness accounts. Around 9:45 p.m., witnesses at the Motel 6 heard two or three gunshots. Nobody could identify the shooter, and descriptions were sparse. One witness, Kevin King, testified that a slim white man, around 5 feet, 9 inches, or 5 feet, 10 inches, and 160 to 170 pounds, walked past the corridor and continued toward a parked car. He was wearing a dark—perhaps dark blue—hoodie. A shorter white man was also in the corridor, talking on a cell phone. Defendant is biracial: part African

American, part Native American. Funteas is white.

¶ 32    Scheau had been shot three times: in the head, the back, and the right arm. There was no evidence of close-range firing. Several .380-caliber bullets and casings were found on the north and west sides of the motel. Two of them were live rounds, indicating that the gun had jammed. A set of footprints and a blood trail led north from the hotel, past a fence, and into an industrial area. Items from Scheau's wallet (credit cards, his driver's license, and so forth), and a Grendel .380-caliber semiautomatic with five live rounds were found in that area. The gun was a match for the spent casings found at the motel. The weapon itself was traced to a deceased man who lived about 35 miles outside of Dallas, Texas.

¶ 33    Video surveillance footage from the Motel 6 and its surroundings showed a white Chevy Spark in the lot of a nearby gas station. Records showed that Dorsey had rented the car in Dallas, the previous day, and returned it to that same location a couple weeks later, on March 16, after racking up 3448 miles. Another video showed someone walk through the Dunkin Donuts drive-thru and head toward the Motel 6.

¶ 34    DiSimone testified at length about the initial stages of the investigation, defendant's first account of events when he came forward and testified to the grand jury, the Michigan jail visit, the interview with Price that raised new questions about defendant, and the circumstances of the December 3 and 4 questioning that culminated in defendant's confession.

¶ 35    DiSimone also testified that the police suspected Funteas of being involved in the murder. (Though not to the exclusion of defendant.) When the police first questioned Funteas about his whereabouts, he said was in Texas, but they later learned that he had flown to Chicago the night before on a ticket paid for by Dorsey. The police continued to investigate Funteas after defendant was charged, but he was uncooperative.

¶ 36    The State played defendant's videotaped confession for the jury. In sum, defendant said that he booked a fake appointment with Scheau and met him in the vestibule of the Motel 6. The first time he fired, he hit Scheau; the second time, the gun jammed. He cleared it and fired again while chasing Scheau on the west side of the motel. Scheau turned the corner and stopped at the wall on the north side of the motel. Defendant put the gun to his head and fired again. After the detectives left the room, defendant said out loud, as if addressing Scheau, "I'm sorry," "I did this for you," and "I did this for your family."

¶ 37    Before defendant took the stand and recanted his confession, the defense began to lay out the other two pillars of its case. The gist of it all was this: defendant's false confession and his innocent proximity to the murder could both be explained by the fact that he was a "victim" of what he sought to brand as Dorsey's "human trafficking." There was much dispute about the extent to which the defense could use this freighted term in front of the jury, but we can leave those disputes aside. The important questions on appeal concern the extent to which the defense was permitted to elicit evidence in support of its theories.

¶ 38    Regarding his confession, defendant's theory was that he was a hapless victim, in dire need of police protection from Dorsey. The detectives led him to believe that they saw matters the same way. But as it turned out, they did not. And when they brought him to the station for questioning, claimed the defense, they refused to honor his attempts to invoke his rights. Overcome by desperation, defendant told the detectives what he thought they wanted to hear.

¶ 39    Defendant first sought to elicit the circumstances of his confession when cross-examining DiSimone. The desired point was that the detectives repeatedly described him as a "victim" (of "human trafficking") who had been "manipulated" by Dorsey. Because these statements were generally made by Norris, not DiSimone, the trial court ruled that the defense had to elicit them

from Norris. When the defense later tried to elicit these statements from Norris in its own case (since he did not testify for the State), the trial court ruled that defendant would have to testify first, since the statements were being offered to show his own "state of mind." The merits of that ruling aside, after defendant testified, the trial court reiterated that the defense could recall Norris for this purpose. For whatever reason, the defense chose not to.

¶ 40　The defense also sought to explain to the jury how he innocently wound up at the scene of Scheau's murder. To this end, the defense called—or tried to call—Price, LaSoya, and Funteas to testify about the threats and coercion that Dorsey used to control his workers.

¶ 41　The State vigorously opposed this evidence at every turn, arguing that it amounted to a defense of compulsion, which Illinois law does not recognize, or something "dangerously close" to it. (We suppose the "danger" would arise from the possibility of jury nullification, based on sympathy for defendant's plight in life as someone who got mixed up with the likes of Dorsey.) But this, too, is a question we can leave aside, for reasons that will become evident.

¶ 42　First, the defense tried to call Funteas, but on the advice of counsel, he took the fifth—not surprisingly, perhaps, given that the defense was accusing him of murder and a detective had just testified that he lied about material facts and was never cleared as a suspect. The trial court found that Funteas had a basis for asserting the privilege and thus barred the defense from calling him.

¶ 43　Price met defendant while working for Dorsey for a few months in 2015, shortly after Scheau was killed. The trial court appointed counsel to confer with Price about the possibility of self-incrimination—not about the murder, but about his involvement in interstate prostitution— and conducted a *voir dire* to ensure that the questioning would steer clear of this incriminating topic. Price then testified for the defense. In sum, he said, Dorsey had a rule prohibiting his workers from competing with his business if they ever left his employment. That said, Dorsey

treated Price "[n]ormally, except for twice when he raised his voice" and yelled at him. After overhearing a conversation between defendant and Dorsey, and seeing defendant upset, Price spoke to defendant and decided to leave Dorsey's business. Dorsey tried to get Price to come back, by "apologizing" and explaining that he did not realize Price "felt dogged out and abused" by him, but Price declined.

¶ 44 LaSoya proved a more fertile witness for the defense. He testified at some length about the tactics Dorsey used to keep his masseurs in line. We will fill in some more details later, but in short, LaSoya told the jury how Dorsey punched him in the face and threw hot coffee on defendant; cloned everyone's cell phones to keep tabs on them; took his workers' money and deprived them of food; and abused, insulted, and "pit" people against each other. Perhaps most importantly for the defense, Dorsey threatened his workers that he would have them killed, by a hitman posing as a client, if they ever quit working for him and went out on their own.

¶ 45 The defense tried to elicit testimony that Dorsey once threatened LaSoya's father, but the trial court excluded this evidence "on notice grounds," since it was not included in the defense's motion *in limine* pertaining to the evidence of Dorsey's operations.

¶ 46 That brings us to defendant's own testimony. By way of background, defendant was a high-school dropout with learning disabilities, post-traumatic stress disorder (PTSD), and anxiety—though he had been off his medications for some years—who struggled to find steady work. (His adoptive parents also testified to these same points.) When Dorsey posted an online ad for a male masseur and was willing to hire defendant on the spot, he accepted, if only because he was desperate for a job.

¶ 47 Defendant described Dorsey's "rules" and the abusive and threatening tactics he used to enforce them. He covered much of the same ground as LaSoya and added some further examples

of threats that Dorsey used to keep him in line. For instance, when Dorsey learned that defendant had given him a fake name, Dorsey put a knife to his throat and threatened to kill him unless he revealed his real name. On other occasions, Dorsey spit in his face and punched him repeatedly. Defendant witnessed Dorsey threaten to kill LaSoya. And after defendant told Price about such things, and Price decided to quit, Dorsey told defendant to slash Price's tires and steal his money. Defendant declined and warned Price (apparently without any harm befalling defendant).

¶ 48    Scheau was the first masseur that defendant met, and they became close friends. Scheau, it seemed, was also Dorsey's favorite, and Dorsey treated him differently. Dorsey was angry and upset, to the point of tears, when Scheau called him and quit over the phone. He told defendant that he would kill Scheau if he went out on his own. Two days later, Dorsey found Scheau's online ad. Dorsey told defendant that he was going to Chicago "to kill that motherf***" and that defendant was coming with him. When defendant said he did not want to go, Dorsey threatened to kill him, too.

¶ 49    So defendant went. They drove together, first to Dorsey's Elk Grove Village apartment, where Dorsey picked up the gun. Then they went to another suburban area to pick up Funteas (who was from Arlington Heights). Funteas was wearing a dark blue hoodie. Dorsey gave Funteas the gun and a burner phone and told him to call Scheau and book a fake appointment. Dorsey drove to the Motel 6 area and parked at a Dunkin Donuts next to a car wash. At Dorsey's instruction, Funteas walked over to the motel and waited in a "hallway area." Defendant identified Funteas as the person seen walking through the Dunkin Donuts drive-thru on the surveillance footage.

¶ 50    Scheau soon appeared, and to make a long story short, Funteas shot him a couple times, while chasing him around the side of the motel. At one point, Funteas had to "cock" the gun (as

if it had jammed). The final shot was to the back of Scheau's head, at point-blank range. Funteas ran away, hopped a fence (where, he said, he tossed the gun and Scheau's wallet), and met up with Dorsey and defendant at a different Dunkin Donuts, about 15 minutes away. Funteas told them that he took a cab to get there. Dorsey dropped off Funteas, wherever it was that they had picked him up, and drove back to Dallas with defendant in tow. Along the way, Dorsey threw the burner phone and Scheau's phone, which Funteas had taken from him, out the window. Dorsey threatened to kill defendant, his family, and Scheau's family if he did not keep his mouth shut.

¶ 51    When Dorsey uncharacteristically fell out of touch in August of that year, defendant seized the opportunity to reach out to Scheau's sister. He told the jury how he got involved in the investigation. He admitted that he lied to the detectives and the grand jury when he said he was in Texas and heard about the murder second-hand from Dorsey. Yet he insisted that he provided "as much [information] as [he] could at that time."

¶ 52    Defendant recounted the jail visit in Michigan and explained how the detectives led him to believe that they saw him as a "victim" of Dorsey whom they wanted to help. He explained how he "hoped" he was going to his "friend's" house when the detectives picked him up at the bus station, but instead, they immediately took him in for questioning. And he gave his account of the circumstances on December 3 and 4 that led to his confession.

¶ 53    Initially, defendant testified, he persisted in his claim that Dorsey was the shooter, largely because he felt a need for police protection: Dorsey had threatened to kill him and his family, and he had the "resources" and "control" to do it. In other words, he hoped to "get [Dorsey] out of the way" by pinning the murder on him. The lie may have struck defendant as harmless enough at the time, since in his view, the murder "wouldn't have happened" if not for Dorsey.

¶ 54    And the detectives repeatedly told defendant that they thought he was a "victim" who had

been "manipulated" by Dorsey. In particular, the detectives said that they thought that Dorsey was the shooter and that he brought defendant along to pin the blame on him. What's more, defendant thought that the detectives were trying to help him get his life in order in exchange for his help in building a case against Dorsey, the truly culpable party.

¶ 55    Defendant admittedly gave the detectives "gradual pieces of information," but that was largely because he did not know where Dorsey was at the time. The tide started to turn when defendant admitted that he was at the scene of the murder, and the detectives told him they already knew that. He grew nervous and upset that he had been less than candid. And even more so when they told him that his most recent version of events was not making sense. That is when defendant started invoking his *Miranda* rights—to no avail, as he would tell the story.

¶ 56    A night in jail, to top it off, left defendant feeling helpless. As he put it, "I thought I came to help. I tried to tell them as much as I could considering my situation, and they wouldn't believe me. I tried to use my rights. I tried to do the right thing, and they were just trampling on everything I tried to do." After calling his mother, he decided "to give them what they wanted."

¶ 57    It was not the case, defendant now concluded from the witness stand, that the detectives wanted to "help" him; what they really wanted was to "flip" Scheau's murder onto him. And they had worn him down to the point where he "just gave up" and said that he was the shooter, even though he knew it was Funteas. Defendant also testified that he falsely confessed, at least in part, to protect Scheau's family from Dorsey. That is what he meant when he said, in his soliloquy after the detectives left the room, that he "did this" for Scheau and his family.

¶ 58    But defendant never really explained why he was willing to take the fall for Funteas. For one, he never explained why he came to believe that the detectives wanted him to confess to the shooting. What they told him is that they believed he was *there*. But they also had information

that *three* people may have been there. And they specifically asked him where Funteas was, but he insisted that he had no idea. Nor did defendant explain why he thought that protecting Funteas at his own expense would assuage Dorsey and thus protect Scheau's family—particularly when every version of events that defendant told implicated Dorsey to one damning degree or another.

¶ 59    Perhaps for these reasons, among others, the jury credited defendant's confession over his recantation testimony and convicted him of first degree murder by discharge of a firearm. The trial court sentenced him to 50 years in prison. This appeal follows.

¶ 60                                    ANALYSIS

¶ 61                                        I

¶ 62    Defendant first argues that his statements to the detectives on December 3 and 4 should have been suppressed as the products of an illegal arrest. In defendant's view, he was under arrest—not formally, but enough for fourth-amendment purposes—when the detectives picked him up at the bus station and drove him directly to the Schiller Park police station for questioning, or at the latest, immediately after he was read his *Miranda* rights at the start of the December 3 interview. And because the detectives did not have probable cause (or a warrant) for an arrest at that time, his statements—above all, his confession on December 4—were obtained in violation of the fourth amendment.

¶ 63    "An arrest occurs when the circumstances are such that a reasonable person, innocent of any crime, would conclude that he was not free to leave." (Internal quotation marks omitted.) *People v. Lopez*, 229 Ill. 2d 322, 346 (2008). The inquiry takes into account "all of the circumstances surrounding the encounter." (Internal quotation marks omitted.) *Kaupp v. Texas*, 538 U.S. 626, 629 (2003). The "involuntary transport [of a person] to a police station for questioning" is functionally the equivalent of an arrest, even if the person is not *formally* placed

- 15 -

under arrest at that time. *Id.*; *Dunaway v. New York*, 442 U.S. 200, 212 (1979). And "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." *Florida v. Royer*, 460 U.S. 491, 501 (1983).

¶ 64    In reviewing a suppression ruling, we defer to the trial court's findings of historical fact unless they are against the manifest weight of the evidence, but the ultimate ruling on the motion to suppress, including the question whether the defendant was arrested, is a legal question that we review *de novo*. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006).

¶ 65    Three preliminary points will help focus our inquiry. First, we agree with defendant that the detectives did not have probable cause for an arrest when they first brought him to the police station on December 3. Indeed, Detective DiSimone did not claim otherwise at the suppression hearing, the trial court did not find otherwise, and the State does not argue otherwise on appeal. So in the interest of brevity, we will forgo any further discussion of this point.

¶ 66    Second, about 20 minutes in, defendant admitted that he had lied to the grand jury about his whereabouts at the time of the murder: he was not in Dallas, as he had claimed; in fact, he drove up to the Chicago area with Dorsey. The trial court found, and defendant does not dispute, that this admission provided probable cause to arrest him for the offense of obstructing justice. 720 ILCS 5/31-4 (West 2014). For ease of reference, we will call this defendant's "initial admission," since it was the first in a string of mounting incriminating statements that eventually culminated in his confession.

¶ 67    We might not go as far as the trial court, which found that the initial admission also provided probable cause to arrest defendant on an accountability or conspiracy theory of murder. Probable cause to arrest him for being complicit in the murder (as opposed to being the shooter)

did arise on December 3—but only after he went on to say that he drove Dorsey to and from the murder scene, knowing that Dorsey was armed and intended to kill Scheau.

¶ 68    In any event, the charge does not matter. The key point is that defendant's admission that he lied to the grand jury justified an arrest, for obstruction if nothing else, before any further incriminating statements were obtained. Thus, those statements will not be subject to suppression, on fourth-amendment grounds, unless defendant was *already* under arrest when he made the admission that initially furnished probable cause. If he was, then the admission was the product of an illegal arrest, and his later statements were (at least arguably) tainted by that same illegality. That is why, as defendant recognizes, he must establish that he was under arrest at the outset of the December 3 questioning.

¶ 69    Third, as a corollary to the last point, if we find that defendant was not under arrest from the start, then we need not decide, with any greater specificity, exactly when he was first under arrest for fourth-amendment purposes. As far as his fourth-amendment claim is concerned, it will suffice to say—as the trial court correctly concluded—that defendant was arrested sometime "after" the initial admission (that he lied to the grand jury) that furnished probable cause.

¶ 70    The crux of defendant's argument is that the detectives set out to conduct what was, for all practical purposes, a custodial interrogation for which they admittedly lacked probable cause. Since they had last spoken to defendant in Michigan and arranged for him to return to the Chicago area after his release from jail, Price had provided new information that defendant, allegedly by his own admission, was at the murder scene with Dorsey. Of course, the detectives didn't know who was lying and who, if anyone, was telling the truth; all they had was conflicting hearsay from two potentially unreliable witnesses. But at the very least they surely suspected that defendant may have lied to the grand jury—and, frankly, that he may have lied *because* he

participated, in one way or another, in Scheau's murder.

¶ 71    Did the detectives impermissibly "seek to verify their suspicions by means that approach the conditions of arrest?" *Royer*, 460 U.S. at 499. There is at least this much to say on behalf of that view: as soon as defendant returned to the Chicago area, following his release from jail and a 14-hour bus ride from Michigan, Detectives Norris and DiSimone drove him directly to the police station, put him in an interrogation room, read him his *Miranda* rights, and began to question him about Scheau's murder.

¶ 72    Not a bad start for defendant's argument, but that is about as far as the argument gets. Defendant's burden is to establish that he was taken in for questioning either by physical force or some other show of police authority, such that he did not accompany the detectives to the station voluntarily and would not have reasonably believed that he had any choice in the matter. *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

¶ 73    The detectives did not use physical force or otherwise coerce defendant with a display of authority. To the contrary, defendant had arranged to meet them at the bus station. In fact, when defendant's bus arrived and he did not see the detectives, he texted them, and asked his mother to reach out to them, to let them know that he was here. Because the meet-up was pre-arranged and seemingly consensual, there was no need for the detectives to draw their weapons, issue any commands that we have been told of, or place defendant in handcuffs.

¶ 74    True, defendant was taken to the station and placed in an interrogation—or, if you like, interview—room, but beyond that, the level of restraint typically associated with an arrest was absent. Defendant was not handcuffed or searched. The door to the room was left unlocked. Defendant says he was dispossessed of his belongings, but—as the video shows—not until later, well *after* he admitted that he lied to the grand jury and thus not until there was already probable

cause to detain him. At the relevant time, for purposes of defendant's argument, he was allowed to keep his belongings, including his cell phone and his as-yet unsearched duffel bag.

¶ 75    Defendant was read his *Miranda* warnings. But so were others—for example, Funteas— whose recorded police interviews are in the record and who were clearly not under arrest at the time. Warnings are sometimes given as a precaution; as DiSimone testified at the suppression hearing, it can be hard to know in advance which presumed witnesses will end up incriminating themselves. (And the witnesses in this case were all involved in illegal activity, even apart from Scheau's murder, just by virtue of their work for Dorsey.) That is one good reason why *Miranda* warnings alone don't make for an arrest. *People v. Wipfler*, 68 Ill. 2d 158, 170-71 (1977); *People v. Marts*, 266 Ill. App. 3d 531, 538 (1994).

¶ 76    What's more, after reading defendant his *Miranda* warnings, Norris said, "officially you are not under arrest. You can walk out of here if you wanted to." Remarks like this are by no means dispositive; in certain circumstances, they might deserve to be dismissed as mere window dressing. But there is no basis for dismissing it here: defendant was not subject to any physical restraints that would have hindered him from leaving; nor did he try to leave, only to be met with pushback, be it physical or verbal, from the detectives. So the remark deserves to be taken at face value. A reasonable person in defendant's position should have thus concluded that he *was* free to leave, at least when the questioning began.

¶ 77    So why did defendant *not* leave if, as he now claims, he did not want to answer questions at that time? For that matter, why did he arrange to meet the detectives as soon as he arrived in the Chicago area? And why did he come back in the first place, when he had no job, no home, no family, no roots here? Ultimately, these questions all admit of the same answer: because he had agreed to cooperate with the detectives as they investigated Scheau's murder and Dorsey's

activities more generally.

¶ 78    During the Michigan jail visit, defendant and the detectives struck a *quid pro quo*. The detectives needed defendant as a cooperating witness—which meant that they needed him close by and out of trouble. And they were not, as defendant insists, feigning to do this purely out of altruistic concern or friendship; they were quite clear that defendant would be a far more credible and thus useful witness if he got his life back in order. In exchange for his cooperation, the detectives would help him find a job, a safe place to live, and access to a boxing gym.

¶ 79    But everything they promised to do for defendant was predicated on his cooperation. He cannot seriously claim that answering further questions about the ongoing investigation, after his release from jail, was not part of their mutual understanding. In short, when defendant returned to the Chicago area, met up with the detectives, and went with them to the station to talk about the recent developments in the case, he was voluntarily cooperating, as he had agreed to do. For the time being, at least, his presence at the police station was consensual. When the questioning began, he was not yet under arrest.

¶ 80    Defendant argues that the detectives "put him under the impression" that he was going to be staying with a friend in Chicago, but rather than allow him to first get situated at his friend's house and make "his own arrangements" to talk to the police at his convenience, the detectives drove him directly to the station. In defendant's view, this shows that he did not go voluntarily.

¶ 81    During the jail visit in Michigan, defendant told the detectives that he hoped to stay with his "really really close friend" Freddie. There is no evidence that he ever made arrangements to stay with this person—or anyone else. So for all the evidence shows, defendant had *nowhere* in the Chicago area to stay. And for their part, the detectives told defendant that they thought it was a bad idea for him to stay with Freddie when he was supposed to be cleaning up his act, since

Freddie apparently was in a gang. So if not disingenuous, defendant's "impression" that the detectives would pick him up, chauffeur him to a "friend's" house, and wait for him to come to the station at his own convenience was at the very least unreasonable.

¶ 82    Defendant's argument rests, in no small part, on his contention that the detectives had come to view him as a suspect in the murder, a point that the State disputes. It is unclear how the detectives' subjective beliefs or working theories about defendant's potential guilt are relevant to the "objective" custody inquiry. See *People v. Surles*, 2011 IL App (1st) 100068, ¶ 23.

¶ 83    And in any event, the distinction between witnesses and suspects is hardly a sharp one. (Though some people will fall squarely on one side of the line.) Suspicion comes in degrees; it may wax and wane as an investigation develops; at any given time, the police may not know exactly *what* to make of a given person. Defendant must have been in this grey area when he returned from Michigan, given what Price had told DiSimone. And that, we take it, was the detective's point when he testified at the suppression hearing, in hedged language, that defendant was "not necessarily" a suspect at the time. All of which is to say, as we said above, that surely suspicions had trained on defendant to *some* degree. So what would he have us make of this fact?

¶ 84    His point seems to be that the detectives "manipulated" and "misled" him "so that he believed he was a witness they planned to take care of, rather than a suspect they sought to implicate." The implication, presumably, is that he would not have gone to the station, unless compelled to do so, if he had understood their true intentions.

¶ 85    The detectives were not required to disclose their suspicions (whatever they may have been) to defendant. It should be obvious that investigators are allowed to play their cards close to their vests. Defendant had agreed to cooperate with the investigation, and if new information later surfaced that raised doubts about his veracity and potential guilt, the detectives could vet

that information without tipping their hand—provided that they did not arrest defendant by established fourth-amendment measures. Here, they did not. Defendant's motion to suppress his statements, on fourth-amendment grounds, was properly denied.

¶ 86                                                    II

¶ 87     Defendant argues that the detectives violated the rule of *Edwards v. Arizona*, 451 U.S. 477 (1981), and thus his *Miranda* right to counsel, in obtaining his confession. His argument is twofold. First, he says, the trial court erred in finding that he initiated the conversation with the detectives, on December 4, after invoking his right to counsel on the previous day. And second, even if he did initiate the conversation, he did not knowingly and voluntarily (re)waive his right to counsel before confessing.

¶ 88                                                    A

¶ 89     By the time defendant invoked his *Miranda* rights on December 3, he had painted himself as Dorsey's driver. The detectives assured him that they still hoped to convince the state's attorney that he was a "victim" and not an "offender," but one glaringly implausible detail of his story—the one that had Dorsey hailing a cab from the murder scene to his enlisted getaway driver, parked at a far-off Dunkin Donuts—stood in the way.

¶ 90     The detectives pressed defendant on this detail and their suspicions that perhaps he was at the Motel 6 when Scheau was murdered, even if they still professed to believe that he was not the shooter. Defendant seemed to realize that he had already implicated himself as a potentially accountable party. (As he put it, he could be charged with "involvement," or "second degree," or "party to.") And he may well have feared that he was only going to make matters worse. The conversation grew increasingly tense, and eventually defendant said, "I'm stressing out. I don't even want to say anything more. I'm telling you all the truth, man."

¶ 91     The detectives forged ahead. Norris asked defendant to locate Dorsey's route to the Motel 6 and other such details on a map of the area that he was sketching. Defendant answered these questions for a few minutes, though the details he provided did not change his basic account of events in any meaningful way. After a break, the detectives returned to the room and told him that these details did not line up with the surveillance footage of the area around the Motel 6.

¶ 92     Defendant responded, "I want a lawyer then guys." But he did not stop talking, as one might have expected. He started rambling—that he wanted to call his mom or go to his friend's house, that Scheau was his friend, that he didn't "give a f*** anymore" whether the detectives went ahead and arrested him, and that he "just dug [him]self in a f***in hole."

¶ 93     Perhaps defendant's rambling left the detectives unsure what his intentions really were. Or perhaps, as the trial court thought, they were too slow to honor an unambiguous request for counsel. Either way, the detectives spent the next few minutes asking if he still wanted to talk. Defendant hemmed and hawed. When asked, the first time around, if he was "still willing to talk *** right now," defendant answered, "I don't know man." The second time around, he asked if he could call his mother first. "Not right now," the detectives told him, asking for a third time if he was "gonna re-talk." Defendant now changed course and said yes. Norris asked if he was sure about that answer and reminded him that "[i]f you're asking for an attorney, which is your right, this interview stops." After another couple of rounds of this back-and-forth, the question was put to defendant plainly: "Do you want an attorney?" And he answered, "yeah."

¶ 94     The detectives immediately left the room. When they returned, defendant asked what was going on. The detectives said that they called the state's attorney, but beyond that, "we can't talk to you" anymore. Defendant was taken to a holding cell, and there was no further questioning on December 3.

¶ 95    In ruling on the motion to suppress, the trial court found that defendant, on two different occasions, invoked two different *Miranda* rights: his right to remain silent and his *Miranda* right to counsel. The admissibility of a statement made after a suspect has invoked his right to remain silent is governed by *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). But when a suspect invokes his *Miranda* right to counsel, the stricter standard of *Edwards*, 451 U.S. at 484-85, applies.

¶ 96    First, the trial court found that defendant unequivocally invoked his right to remain silent when he said, "I don't even want to say anything anymore." Applying *Mosley*, the trial court thus suppressed everything that defendant said after this point on December 3. But that ruling did not result in the suppression of his earlier incriminating statements or, more importantly, his outright confession on December 4. In fact, it had no meaningful effect on the State's evidence at all.

¶ 97    Second, defendant also invoked his *Miranda* right to counsel. The trial court thought that his first ostensible request for an attorney—when he said, "I want a lawyer then guys,"—was unequivocal enough to invoke the right, despite the rambling and equivocation that immediately followed. That said, the ensuing back-and-forth was limited to a clarification of his intentions; he did not make any more substantive statements, nor did the detectives ask any more substantive questions, about the investigation. Either way, once the detectives were—perhaps belatedly— satisfied that his request for counsel was unequivocal, the interrogation stopped.

¶ 98    Although the trial court found that defendant invoked his *Miranda* right to counsel, the court went on to rule that his December 4 confession was admissible under both *Mosley* and *Edwards*. It was error, though harmless error, to apply *Mosley* here; the stricter *Edwards* rule must be satisfied when the suspect has demanded counsel.

¶ 99    The police have (at least some) leeway to reinitiate custodial questioning after a suspect invokes his right to remain silent. See *Mosley* 423 U.S. at 102-06. But if the suspect invokes his

*Miranda* right to counsel, any statements made in response to further custodial interrogation are inadmissible unless counsel is present or "*the accused himself* initiates further communication, exchanges, or conversations with the police." (Emphasis added.) *Edwards*, 451 U.S. at 484-85.

¶ 100    Here, defendant requested an attorney but later confessed without one present. Thus, regardless of other circumstances, his confession is admissible only if defendant, without prompting, reinitiated the discussion of Scheau's murder. The trial court found that he did.

¶ 101    There is no dispute that DiSimone went to defendant's holding cell on the morning of December 4. But DiSimone testified that he just went to check on defendant—to see if he had been fed and more generally how he was doing—and did not question him at all about Scheau's murder. Defendant asked to make a phone call, and DiSimone took him to an interview room to make the call. Defendant called his mother, who (as she testified) told him that he was an adult now and needed to figure this out on his own. After the call, he told DiSimone that he wished to speak to the detectives about the investigation again. DiSimone turned on the video camera, and that is when defendant confessed.

¶ 102    If credited, DiSimone's testimony establishes that defendant "initiated" the December 4 conversation. To "initiate" a conversation, within the meaning of *Edwards*, the suspect "must make a statement that evinces a 'willingness and a desire for a generalized discussion about the investigation.' " *People v. Woolley*, 178 Ill. 2d 175, 198 (1997) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (plurality opinion)). "Inquiries or statements that relate to the routine incidents of the custodial relationship will not generally 'initiate' a discussion for purposes of the *Edwards* rule." *Id.* at 198-99 (quoting *Bradshaw*, 462 U.S. at 1045). These might include "a request for a drink of water or a request to use a telephone." *Bradshaw*, 462 U.S. at 1045. And the point cuts both ways: neither the suspect nor the police initiate a conversation by

making such "routine" statements or inquiries. *Id.*

¶ 103    DiSimone's inquiries of defendant at the holding cell, at least on the detective's version of events, were confined to the "routine incidents" of custody, while defendant's own statement, after the phone call to his mother, indicated that he wanted to talk about the investigation.

¶ 104    Defendant continues to dispute the detective's account of events. As defendant would have it, for example, DiSimone only allowed him to make a phone call on the condition that he agreed to resume talking about the case. That would make DiSimone responsible for initiating the December 4 conversation. But the trial court specifically found DiSimone, not defendant, credible on these matters.

¶ 105    Defendant asks us to reverse that credibility finding. In addition to the usual—and usually decisive—points about deferential review, his argument must overcome two more significant hurdles. For one, he asks us to direct a credibility finding in his favor notwithstanding the fact that he admittedly lied to a grand jury in this very case. And second, before defendant confessed on December 4, he acknowledged on camera that *he* initiated further discussion with the police. Though the December 4 recording was not included in the record on appeal, the trial court quoted the relevant colloquy between Norris and defendant in its written order, and nobody disputes the accuracy of that rendition.

¶ 106    Norris, who was not present for the conversation at the holding cell, said to defendant, "I just wanna make sure you—you asked me that—you said you wanted to talk to me." Defendant responded, "Yeah." Norris followed up: "We didn't ask you to talk to us. We didn't tell you— you're doing this on your own free will. You I you wanna—wanna us—very—very clearly 'cause yesterday you had asked for a lawyer. *You are initiating contact with us* and want to continue to speak with us." (Emphases added.) Defendant answered, "Yes."

¶ 107   In sum: the trial court heard live testimony and found DiSimone credible; defendant, for his own part, not only seriously damaged his credibility by lying to the grand jury, but also later admitted, on video, that *he* reinitiated the discussion of Scheau's murder. It is all but impossible to find, in this combination of circumstances, that the trial court's credibility determination was against the manifest weight of the evidence.

¶ 108   It is fair to point out that, in the trial court's view, DiSimone (and Norris) showed at least some disregard for defendant's *Miranda* rights, and that finding certainly bears on the detective's credibility in this context. Defendant offers a host of further reasons why DiSimone supposedly was not credible. Most of these points were raised and rejected below; all have been considered (again) on appeal, and none merit sustained discussion. Suffice it to say that they either rest on assertions that defendant cannot substantiate; are contradicted by unrebutted evidence; or, at their best, offer minor points of impeachment that do not come close to carrying defendant's high burden. We will not disturb the trial court's credibility determination.

¶ 109                                                    B

¶ 110   The *Edwards* rule requires not only that defendant initiated the conversation with the police on December 4, but also that he validly waived his *Miranda* right to counsel at that time. *Id.* at 1044; *Woolley*, 178 Ill. 2d at 199. To be valid, a waiver must be knowing and voluntary, in light of all the circumstances, "including the fact that [defendant] reopened dialogue with the police." *Woolley*, 178 Ill. 2d at 199.

¶ 111   Defendant's arguments slide at times between the voluntariness of his waiver (a *Miranda* inquiry) and the voluntariness of his confession (a due-process inquiry). But his arguments do not succeed either way, and for largely the same reasons, so we will get right to them and not

belabor any fine distinctions between these legal standards. By our count, his arguments are all variations on four basic themes.

¶ 112    First, defendant argues that the detectives "ignored" his "numerous invocations of his rights" on December 3, put him in a jail cell overnight after he requested an attorney, and never made any arrangements for the provision of counsel, as he requested. All in all, defendant says, the conduct of the detectives left him with "no way of knowing he had a right to counsel" or at least not one that would be honored.

¶ 113    As the trial court saw matters, the detectives did not scrupulously honor defendant's *Miranda* rights at every turn. That is a fair enough starting point, but it goes too far to say that their conduct would have reasonably conveyed to defendant that he had no right to counsel worthy of the name. The conclusion of the December 3 questioning proves the point: when the detectives were satisfied that defendant was unequivocally invoking his *Miranda* right to counsel, the interview came to an immediate end.

¶ 114    Granted, the interview arguably should have ended even earlier than it did. But it is also arguable that defendant's earlier attempts to invoke his rights were somewhat equivocal, at least when viewed in context. On its face, "I want a lawyer then, guys," may sound perfectly clear, but in the same breath, defendant also said, among other things, that he wanted to talk to his mother and go to his friend's house and that he did not care anymore if he was arrested right then and there. In all fairness, his rambling speech may have left the detectives uncertain about what he really wanted to do, if not wondering whether *he* even knew what he wanted to do.

¶ 115    In any event, as we have observed, once the topic of counsel was broached, the rest of the interview was limited to a clarification of defendant's intentions; no further questions about the investigation were posed. And while the detectives may have failed to honor defendant's earlier

invocation of his right to remain silent, as the trial court held, the fact remains that his request for counsel did put an end to the questioning on December 3. As Norris said to him more than once in this context, "If you're asking for an attorney, which is your right, this interview stops." Again: "It's your right. We have to follow the law."

¶ 116    So while the detectives may not have fully complied with *Miranda* along the way, their conduct did not manifest the kind of flagrant and persistent disregard for defendant's rights that he alleges. His *Miranda* right to counsel, in particular, was honored when he clearly invoked it. He could not reasonably believe, based on the questioning so far, that it would be futile to stand on that same right the following day.

¶ 117    The fact that defendant spent the intervening night in a holding cell does not change this conclusion. This was not, as he suggests, an unlawful detention used to coerce a *Miranda* waiver and confession out of a suspect who has requested counsel. It was a lawful detention justified by probable cause: defendant had admitted to obstructing justice and, more importantly, had cast himself as a knowing driver who was thus potentially accountable for the murder. See, *e.g.*, *In re G.O.*, 191 Ill. 2d 37, 54 (2000) (legality of detention is one factor in voluntariness analysis).

¶ 118    Defendant does not explain how a lawful detention—free of any coercive conditions, as far as we have been told—vitiated his waiver of counsel the next morning. The closest he comes is imputing a coercive motive to the detectives: they put him in a holding cell for the purpose of "eroding his will" and extracting "more information" from him. There is no evidence to support this allegation, but in any case, the detectives' (alleged) subjective intentions are not a basis for finding his *Miranda* waiver invalid. *Moran v. Burbine*, 475 U.S. 412, 423 (1986). And nothing else about his lawful detention shows that he was coerced into waiving counsel and confessing.

¶ 119   That includes the fact that an attorney was not provided before defendant confessed. The *Miranda* right to counsel is simply a right not to be interrogated in police custody without counsel present. See *Edwards*, 451 U.S. at 484-85 (citing cases). It does not mean that the detectives had to drop everything to find defendant a lawyer—as long as the questioning stopped when the right was invoked, which it did. Nor did defendant spend an undue amount of time in custody without access to counsel: he was taken to a holding cell at 4:40 p.m. on December 3, at nearly the end of the business day; the sequence of events that culminated in his decision to resume talking about the murder unfolded between 9:30 and 10:30 a.m. the next morning. See *G.O.*, 191 Ill. 2d at 54 (duration of detention a factor in voluntariness analysis).

¶ 120   And there is no evidence that DiSimone thwarted defendant's attempts to call a lawyer or his mother on the evening of December 3. Nothing in the record establishes that he ever tried to call a lawyer directly, and the trial court found that he *did* call his mother that evening. (Not to mention the next morning, when she told him, in so many words, that he was on his own.) This factual finding was based on testimony from DiSimone and defendant's mother, which the trial court found credible and corroborated by telephone records.

¶ 121   Defendant's principal citations are too inapposite to bear explicit discussion, so we will leave the matter at that. In short, he was not, as he alleges, badgered and coerced into a *Miranda* waiver by detectives who repeatedly thwarted his attempts to assert his rights.

¶ 122   Second, in a recurring theme, defendant argues that the detectives "manipulated" him (and his parents) into believing that they viewed him as a victim of Dorsey's sex-trafficking operation and that they wanted to help him get his life back together. Defendant makes no serious effort to explain how this supposed deceit vitiated his *Miranda* waiver or rendered his confession involuntary. And the theory has problems of all sorts. For one, it was defendant who

painted himself as Dorsey's victim from the very start. He came forward, when the police had no idea who he was, and offered to implicate Dorsey in the murder in exchange for money and police protection from Dorsey.

¶ 123    At the risk of repetition, the detectives may never have been entirely sure what to make of defendant. For what it's worth, they gave him enough credence, at least at the outset, to have him testify to a grand jury—in the role of a victim who innocently witnessed a murder at the hands of his violent pimp. Of course, that assessment would evolve as the investigation unfolded and evidence emerged that he may well have been lying from the start.

¶ 124    But more to the point: defendant is trying to argue that his waiver and confession were involuntary because the police gave—or rather feigned to give—credence to his own words. If we were to accept that this was police "deception" of the sort that vitiates a *Miranda* waiver or results in an involuntary confession, we would effectively require investigators to disclose their doubts, rather than play along for a time, while they sized up their subject and vetted his story. That would tie law enforcement's hands to an unprecedented, and unacceptable, extent. Here, defendant painted himself into a corner with his own lies. The detectives may have let him do that, but that is not police coercion.

¶ 125    Third, building on this theme, defendant argues that the detectives made express promises of leniency, if not outright non-prosecution, on December 3. A promise of leniency is one factor, and no doubt a weighty one, in a voluntariness analysis—but only when the police have assured a suspect that he will reap a "specific benefit" from making a statement. *People v. Henslick*, 2022 IL App (4th) 200481, ¶ 37.

¶ 126    There are numerous examples here of a detective, usually Norris, telling defendant that he was "a victim of human trafficking," and hence that the detectives would "defend" him in

front of the prosecutor as someone who "should be treated like a victim," not "an offender." Though Norris often walked a fine line in making these statements, he did not promise defendant any specific benefit in exchange for a statement.

¶ 127   We will not try to catalog every remark, but here is a characteristic example: "You're a victim of human trafficking. Me and my partner think we can present this to the State's attorney that way. You're a victim. Regardless of how much your involvement was. Now understand that I'm not making any promises, but I do believe you're a good guy."

¶ 128   In the same vein: "Every part of this was a part of being a victim. Not an offender, a victim. * * * Again, not making any promises, but I will tell the State's attorney he is not an offender, he's a victim."

¶ 129   And Norris disclaimed any promises at least one other time. Earlier on, when defendant first expressed concern that he was "in trouble now" because he had just admitted that he lied to the grand jury, Norris responded, "at least you're still in our hands," and "we can still do stuff for you, we can still try and help you." (That is, before "a bunch of attorneys" get involved.) But he qualified that remark with, "I'm not going to promise you anything, or anything like that, because that would be wrong."

¶ 130   Norris came dangerously close to telling defendant that he need not fear being charged in connection with Scheau's murder. An unqualified statement to that effect would almost certainly vitiate a *Miranda* waiver and render a confession involuntary. But Norris repeatedly offered the caveat that, while he and DiSimone would advocate for defendant when it came time for the prosecutor to pursue charges, he made no promises about what the prosecutor would ultimately decide to do.

¶ 131 So all in all, Norris's comments did not cross the line between impermissible promises of a specific benefit and what defendant calls "the standard offers to put in a good word with the judge" or, rather, the prosecutor. See, *e.g.*, *People v. Hanlon*, 137 Ill. App. 3d 305, 320-21 (1985) (officer willingness to put in "good word" with bond-court judge, qualified by statement that officer cannot promise anything, not offer of leniency); *People v. Hubbard*, 55 Ill. 2d 142, 152 (1973) (promise to tell prosecutor of defendant's cooperation not offer of leniency).

¶ 132 Lastly, defendant argues that the detectives "preyed upon [his] vulnerabilities much as Dorsey had preyed upon [him]," knowing that his circumstances left him "vulnerable to coercion." In addition to being a human-trafficking victim, a theme we have already addressed, defendant says that he was a sleep-deprived special-education student with a history of anxiety (and similar "mental deficits") who did not take any medication while he was held overnight by the police.

¶ 133 There was no dispute that defendant was provided with a place to sleep while he was held at the station. (And the day before, he surely could have slept on his 14-hour bus ride.) While he apparently suffered from anxiety and PTSD when he was younger, it was undisputed that he had not taken medication for those issues since his sophomore year in high school. He may have been a special education student back then, but he had also been a member of the national guard. More importantly, a psychologist and a psychiatrist from Forensic Clinical Services both found that he was capable of understanding his *Miranda* rights. He was fed at least twice at the station, and there are no allegations of physical or mental abuse. He clearly understood the detectives' questions, he grasped the legal implications of his statements, and he knew what rights were his to invoke and how to invoke them. In sum, there is no merit to his claim that his special "vulnerabilities" were exploited and used to coerce him.

¶ 134   We are well aware that there are many critics of police tactics whereby officers feign sympathy or prey on the hopes or naivete of suspects, pretending to be allied with the suspect, when in fact they are not. We are not immune to our own opinions on such tactics. But the only question for us is whether the tactics described here crossed constitutional boundaries. For the reasons stated, they did not. The motion to suppress on *Miranda* grounds was properly denied.

¶ 135                                             III

¶ 136   Defendant next argues that the trial court denied him his due-process right to present a complete defense. Specifically, the court barred him from eliciting testimony from the detectives about the circumstances of the December 3 questioning that were relevant for the purpose of establishing that his confession the following day was "involuntary."

¶ 137   Properly speaking, the question for the jury was the *reliability* of defendant's confession; *voluntariness*, a distinct though at times overlapping concept, is a threshold legal question that determines the admissibility of a confession and is therefore a question for the court to decide before the trial. 725 ILCS 5/114-11(a), (f) (West 2014); *People v. Jefferson*, 184 Ill. 2d 486, 498 (1998); see *Crane v. Kentucky*, 476 U.S. 683, 688-89 (1986); *Jackson v. Denno*, 378 U.S. 368, 384-85 (1964). But in light of our disposition of this claim, we need not insist on the distinction or explore its potential consequences on the arguments and rulings below.

¶ 138   When all was said and done, the trial court did not actually bar the defense from eliciting the evidence in question. A close reading of the record on each of the disputed topics will bear this out. A word of caution: we set forth the trial court's reasoning for expository purposes, but we do not generally endorse the logic of the trial court's rulings. There are significant errors in reasoning along the way, but because the errors proved harmless, we will not dwell on them at any length.

¶ 139    First, defendant argues that he was barred from eliciting evidence of Norris's statements to him on December 3, all to the effect that Dorsey was engaged in "human trafficking," that he "used" defendant, and that defendant was a "victim" of his predatorial enterprise.

¶ 140    The defense first tried to elicit these statements when it cross-examined DiSimone in the State's case-in-chief. The trial court ruled that the defense could only elicit them from Norris, since they were his statements. When the defense tried to elicit them from Norris, on direct examination in its own case, the trial court ruled that defendant would have to testify first. If he did, the defense could recall Norris for this purpose.

¶ 141    The trial court reasoned as follows: Norris's statements were being offered on the issue of "(in)voluntariness," which is a "state of mind;" only defendant could testify to his state of mind; thus, Norris's statements would be "hearsay" unless defendant first testified about his own state of mind and Norris's statements were "tied up" to that testimony.

¶ 142    Defendant testified, but the defense did not recall Norris. The trial court specifically stated on the record that it was permitting the defense to recall Norris for the purpose of eliciting these statements to defendant and that the defense was choosing not to do so. In short, the trial court did not "bar" this line of inquiry; rather, the court made it conditional on defendant taking the stand, which he did. That was error, but harmless error; ultimately, this line of inquiry was not pursued as a result of a decision by defense counsel, not trial-court error.

¶ 143    Though we promised not to dwell, we are compelled to say this much: a defendant may elicit the circumstances of his confession—including statements made to him by interrogating officers—to show that it was false and unreliable. When offered for this purpose, the officers' statements are not hearsay, regardless of whether the defendant testifies. And so the statements may be elicited, regardless of whether the defendant testifies. Even if the confession's truth or

reliability under the circumstances implicates the defendant's "state of mind," there is nothing improper or unusual about parties making arguments, and juries drawing inferences, about a defendant's "state of mind" without any direct testimony from the defendant on this topic.

¶ 144   Back to the record. Second, defendant argues that he was barred from eliciting evidence, during the cross-examination of DiSimone, that the detectives ignored his invocations of his *Miranda* rights on December 3.

¶ 145   The trial court's reasoning was similar: this evidence was being offered on the issue of voluntariness, so it could only be offered if the defense first "put[s]" on a case that leaves it "in a position to link this to the defendant's state of mind." If and when that happens, the trial court said, it would then consider whether any specific testimony that the defense sought to elicit on this topic was permissible.

¶ 146   The defense put on a case. Defendant testified that the detectives continued to question him after he said that he was done talking to them and requested a lawyer. This and other police tactics left him feeling "hopeless," as he "tried to use [his] rights," but the detectives "just trampl[ed] on everything [he] tried to do." And that hopelessness is what led him to "give them what they wanted," which, he believed, was his confession.

¶ 147   So for one, defendant did have an opportunity, through his own testimony, to offer the jury evidence of the police conduct in question and to argue that this conduct contributed to his "involuntary" confession.

¶ 148   What's more, the defense never recalled DiSimone to elicit his own testimony on these points (say, to corroborate defendant's account). While the trial court did not specifically make a record that it was permitting the defense to recall DiSimone, as it did with Norris, that does not mean that the court barred the defense from doing so. Rather, as it did with Norris, the trial court

erroneously made this line of inquiry conditional on defendant's testimony about his "state of mind." We will not speculate as to what the trial court would have allowed the defense to elicit from DiSimone after defendant testified. It suffices to say that when the time came, the defense evidently chose not to pursue this issue any further.

¶ 149    Third, defendant argues that he was barred from eliciting evidence that the detectives ignored his requests for a phone call for much of December 3—another factual predicate for his argument that his "will was overborne" when he confessed.

¶ 150    This issue arose in a sidebar, during the State's direct examination of DiSimone. Defense counsel argued that the State's questions about defendant's access to a phone at 4:40 p.m., right before he was taken to a holding cell, "opened the door" to questions about his access to a phone earlier in the day, when his request for a phone call was denied. (Recall that he asked to call his mother while the detectives were asking him to clarify whether he wanted a lawyer.) Counsel sought a ruling permitting the defense to explore this topic on cross-examination.

¶ 151    The trial court ruled, sensibly enough, that it would cross that bridge if and when the time came. It was not going to issue a blanket ruling preemptively, "in a vacuum," before any specific question from the defense was pending. Defendant does not identify any instance when counsel later attempted to cross-examine DiSimone on this particular topic but was barred from doing so. And we have not found any such instance, either.

¶ 152    Defendant also argues that he was barred from impeaching DiSimone's testimony that the 4:40 p.m. call "could have been" to an attorney. On direct, the State asked DiSimone if there was a video recording of defendant making that call. DiSimone said no; the State asked why, given that the call was placed from an interview room that has recording equipment; and the detective explained, "We didn't know who he was calling. He could have been calling an attorney."

¶ 153   The context made clear that DiSimone was simply offering a general explanation for why the police do not record the phone calls placed by suspects. And on cross-examination, defense counsel underscored this point by asking DiSimone to confirm that the call was not recorded "[b]ecause you didn't know who he was talking to." DiSimone answered "[c]orrect," and counsel did not pursue the point any further. And frankly, the topic could not bear much more emphasis than that. The point was made, for all it was worth, that defendant was afforded a call before he was taken to the holding cell, and that the police do not monitor or record such calls in general because, for all they know, any given suspect might be calling a lawyer.

¶ 154   Lastly, defendant points to one instance where the trial court actually did bar the defense from eliciting certain testimony from DiSimone. And properly so. During its redirect, the State asked DiSimone if defendant's "story" on December 3 "remained the same" as what he initially said when he came forward in September and pointed the finger at Dorsey. DiSimone said no, and the trial court agreed that the question "opened the door" to questioning by the defense, on re-cross, as to the specifics of the changes in defendant's account of events. Defense counsel then pursued this topic in various ways.

¶ 155   But when counsel asked DiSimone if "some of the change in that story had to do with threats Tim Dorsey made to [defendant]," the trial court sustained the State's objection. (No basis for the objection was stated.) Defendant says that was error; the question was relevant to his "state of mind" and thus the involuntariness of his confession.

¶ 156   If anything here may be relevant, it is not the change in defendant's story but rather the threats themselves that Dorsey allegedly made to defendant. Surely *defendant* could testify that Dorsey threatened him. And he did. But all DiSimone could offer was testimony that defendant *said* that Dorsey threatened him. If offered to "prove the truth of the matter asserted"—that

Dorsey threatened defendant—that testimony would be the classic definition of hearsay. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); Ill. R. Evid. 802 (eff. Jan. 1, 2011). The trial court correctly excluded it.

¶ 157                                             IV

¶ 158   Defendant argues that the trial court further deprived him of his right to present a defense when it barred him from offering evidence of "human trafficking," which "played a central role in every aspect of this case." Specifically, defendant says that this evidence was relevant to two critical issues at trial: why he (involuntarily) confessed to a murder that he did not commit, and why he was at the scene of that same murder. The evidence at issue falls into two categories that roughly correspond to these two purposes.

¶ 159   First, defendant reiterates his arguments that Norris's statements on December 3, to the effect that defendant was a "victim" of "human trafficking," were essential to an explanation of why he falsely confessed: he felt helpless and in need of police protection, so he said what he "reasonably believed" the detectives wanted to hear. Whatever the merits of this theory, it suffices to say, as we said above, that the trial court permitted the defense to recall Norris for this purpose, but the defense chose not to do so. The trial court did not deny defendant an opportunity to present this aspect of his defense.

¶ 160   Second, defendant argues that the trial court barred him from eliciting evidence of the manipulation, abuse, and threats that Dorsey used to maintain his operation from three former masseurs: Funteas, Price, and LaSoya. This evidence would help defendant explain to the jury that he was at the murder scene as the result of coercive pressures exerted on him by Dorsey.

¶ 161   We will put aside the State's arguments that the defense was trying to backdoor a theory of compulsion, which Illinois does not recognize as an affirmative defense to murder (*People v.*

*Gleckler*, 82 Ill. 2d 145, 156 (1980); see 720 ILCS 5/7-11 (West 2014)), and that none of the evidence on this general topic had any permissible purpose. That position goes a bit too far, though there are very real concerns that defendant was pushing the bounds of relevance in an effort to elicit sympathy for his plight as someone who had been under the thumb of a man like Dorsey. In any case, there are narrower grounds for disposing of the particular points of error he presses: his arguments rest on unfair and misleading characterizations of the record.

¶ 162   We begin with Funteas. On the advice of counsel, Funteas indicated that if called as a witness, he would invoke his fifth-amendment privilege against self-incrimination. The trial court found that he had a basis for taking the fifth and thus barred the defense from calling him. Defendant asserts that this ruling was error. It was not.

¶ 163   Outside the presence of the jury, Funteas told the trial court that "it would make me feel comfortable" to talk to a lawyer before testifying, since "Schiller Park [*i.e.*, the police] is trying to get me" and "I'm not trying to incriminate myself in any way." (Funteas had also told defense counsel that he wanted a lawyer.) The trial court said that this was not enough to appoint counsel and that, without more information, it would direct Funteas to comply with the defense subpoena and testify.

¶ 164   The defense conducted a *voir dire* of Funteas. Once the trial court realized that he was a part of Dorsey's operation, the court asked defense counsel if the questioning "will potentially put [Funteas] in a position where he could incriminate himself," "[n]ot on necessarily the offense that's charged but on other matters, whether they be prostitution, Mann Act violations." Counsel candidly answered, "Yes." The trial court appointed counsel to advise Funteas on the risk of implicating himself in an interstate prostitution ring. (Since the statute of limitations on a state-law prostitution charge had evidently run out, but the federal limitations period had not, the trial

court was primarily concerned that the defense witnesses might implicate themselves in federal offenses.)

¶ 165   Defendant suggests that even this step went too far, that there was never any indication that Funteas would be unwilling to testify, and that there was ample assurance from the defense that it had no intention of eliciting incriminating testimony from Funteas. That is not true, nor is the accompanying implication that the trial court took it upon itself to nudge Funteas off the witness stand. See, *e.g.*, *People v. Sapp*, 2022 IL App (1st) 200436, ¶¶ 42-43.

¶ 166   And worse yet, defendant simply ignores the rest of the story. After hearing DiSimone's trial testimony, the court realized that the potential for self-incrimination went "much further and deeper" than a possible (if unlikely) interstate-prostitution charge.

¶ 167   DiSimone testified that Funteas was suspected of also having a hand in Scheau's murder, that he continued to be a suspect after defendant was charged, and that he refused to cooperate with the investigation. Funteas lied to the police about his whereabouts at the time of the murder: he said he was in Houston, but in reality, he had flown to Chicago the night before, on a ticket paid for by Dorsey.

¶ 168   It was now "clear" to the trial court that the defense was "suggesting" that Funteas was "potentially responsible" for the murder. That turned out to be an understatement: the defense did not merely suggest this as a possibility; defendant later took the stand and flat-out accused Funteas of shooting Scheau.

¶ 169   So of course the defense was out to elicit incriminating testimony from Funteas. And not just about his work as a prostitute; the defense was looking to pin the murder on him. Thus, when the defense made an offer of proof, in a second round of *voir dire*, counsel asked Funteas if he worked for Dorsey in February 2015, if he traveled to Chicago the night before the murder, if the

police showed him a receipt for the airline ticket he traveled on, if he was questioned about the murder on numerous occasions, and, in so many words, if he had refused to cooperate with the investigation. In short, where were you at the time of the murder, why did you lie to the police about it, and what else have you been hiding?

¶ 170 "A witness may be denied her fifth amendment privilege only when it is perfectly clear, from a careful consideration of all the circumstances in the case, that her answers cannot possibly have [a] tendency to incriminate her." (Internal quotation marks omitted). *Id.* ¶ 43. The risk of self-incrimination could hardly have been more evident for Funteas. He had a right to take the fifth, and the trial court did not err in honoring his invocation of the privilege.

¶ 171 Next up is Price. Defendant asserts that the trial court, seemingly out of the blue, ordered a *voir dire* in advance, which had the result of "unfairly limit[ing]" the testimony that the defense could elicit from him. Not so.

¶ 172 When Price first took the stand as a defense witness, counsel established that he worked for Dorsey for a few months in 2015 and that this work took him "[a]ll over the United States." Counsel then asked, "What did you do for [Dorsey]?" The State objected and asked for a sidebar, during which the trial court agreed that there was a risk of Price implicating himself in interstate prostitution. And the trial court was not at all convinced that Price knew anything of his fifth-amendment rights. So the court appointed counsel to advise him.

¶ 173 To make a long story short, the public defender advised Price that he was not in jeopardy of incriminating himself, provided that neither side inquired about any illegal activities he may have performed during his employment with Dorsey. (In a word, prostitution.) And if that should happen, the public defender advised Price to ask for a sidebar. The trial court did not want to risk having a witness take the fifth in front of the jury, so the court asked defense counsel to proffer

the intended examination in a *voir dire*.

¶ 174   Counsel did so, steering clear of any implication that Price was engaged in prostitution. Counsel asked Price, in sum, about certain conversations with defendant and the circumstances that led him to quit Dorsey's operation. After the *voir dire*, the trial court ruled that Price would not have any basis for taking the fifth and therefore could testify to the matters that counsel had proffered, which he went on to do.

¶ 175   So it is not by accident that defendant's brief utterly fails to explain *how* the trial court "unfairly limited" the examination of Price or "restricted [his] testimony in error." There was *nothing* in the proffered examination that was excluded from Price's testimony—except the incriminating fact that his work for Dorsey had him engaging in interstate prostitution. But defendant did not need *that* fact about Price to support his theory that he, defendant, was at the Motel 6 as the result of coercion and manipulation by Dorsey.

¶ 176   Defendant also claims that he was barred from eliciting testimony from LaSoya about "Dorsey's threats." LaSoya testified at some length about Dorsey's operation and the abusive, threatening tactics he used to keep his masseurs in line.

¶ 177   For example, LaSoya explained how Dorsey cloned all of their cell phones, which he had provided "for business purposes," in order to keep tabs on them. Dorsey would become violent if a masseur failed to pick up a call; on one occasion, he punched LaSoya in the face for this reason, and on another, he threw hot coffee on defendant. He would renege on his financial agreements with his employees, take their money, and deprive them of food. He would "pit" people against each other and "insult" them. He had a way of "break[ing] you down to the point of no return."

¶ 178   Dorsey threatened his workers that he would have them killed—by a hit man posing as a

client—if they had the audacity to quit working for him and go out on their own, as Scheau did; Dorsey considered this "stealing" from him. LaSoya eventually had enough; he quit after Dorsey hit him again, this time "really hard" and in the ear.

¶ 179    So it is not as if the defense was generally "barred" from telling its story through LaSoya. His testimony provided a basis for the defense to argue that Dorsey had a motive to kill Scheau or to have him killed, and it supported defendant's own claims about Dorsey's manipulative and threatening tactics.

¶ 180    What defendant objects to is really the exclusion of one particular piece of testimony, a threat that Dorsey allegedly made to LaSoya's father. The trial court had ruled *in limine* that the defense could elicit evidence of specific threats that Dorsey issued to his workers, for the specific purpose of controlling them and maintaining his operation. But "generalized threats" that painted Dorsey as a "bad guy," without being tied to this purpose, were "off limits." Fair enough.

¶ 181    The trial court initially thought that the threat to LaSoya's father—a threat to "shoot up" his medical practice with a semiautomatic weapon—ran afoul of that ruling, since it was not directed at LaSoya personally. The trial court seemed to miss the point that threatening loved ones can be a particularly effective, not to mention cruel, method of coercion. (It can even be *more* effective than a direct threat. Just think of threatening someone's children.) The defense clarified, in a sidebar, that the threat *was* being offered for the purpose deemed permissible: Dorsey was of course seeking control over LaSoya, not LaSoya's father.

¶ 182    The trial court quietly conceded that point, as we read the record, but then ruled that the State's objection to this testimony would be sustained "on notice grounds" instead. Defendant's motion *in limine* never mentioned this threat, much less the basis for admissibility that counsel had just articulated. The prosecutor added that this was the first the State had heard of it, and that

no discovery on this topic had been received.

¶ 183   Defendant's briefs do not even mention the actual basis for the trial court's ruling, never mind challenge the conclusion that the defense failed to give adequate notice of this evidence. We cannot supply that argument for defendant. But suppose we did and that we found the ruling to be in error. This one isolated error, given everything else that LaSoya was permitted to say in the service of the defense case, would not come close to warranting a new trial.

¶ 184                                             V

¶ 185   In 2013, approximately six years before his trial in this case, defendant was convicted in Texas of aggravated robbery. The defense moved *in limine* to bar the State from introducing this prior conviction as impeachment evidence. The trial court denied the motion, with qualifications that we will discuss shortly. Defendant argues that this ruling was error.

¶ 186   Illinois Rule of Evidence 609 governs the admissibility of a witness's prior conviction as impeachment evidence. Ill. R. Evid. 609 (eff. Jan. 1, 2011) (codifying *People v. Montgomery*, 47 Ill. 2d 510 (1971)). Prior convictions are admissible for this purpose "only if" (1) the crime was punishable by (death or) more than one year in prison under the law of the jurisdiction in which the witness was convicted, *or* (2) the crime "involved dishonesty or false statement." Ill. R. Evid. 609(a)(1)-(2) (eff. Jan. 1, 2011).

¶ 187   In either case, the conviction is inadmissible if its "probative value *** is substantially outweighed by the danger of unfair prejudice" (Ill. R. Evid 609(a)(3) (eff. Jan. 1, 2011)); if it was obtained through a plea of *nolo contendere* (Ill. R. Evid. 609(a) (eff. Jan. 1, 2011)); or if more than 10 years has elapsed since the date of conviction or the witness's release from confinement (Ill. R. Evid. 609(b) (eff. Jan. 1, 2011)). We review the trial court's ruling for an abuse of discretion. *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 79; *People v. Mullins*, 242 Ill.

2d 1, 15 (2011).

¶ 188   Defendant never mentions Rule 609, but a quick march through its elements shows that his prior conviction was admissible, subject to the balancing test in clause (a)(3). It was obtained pursuant to a guilty plea, not a plea of *nolo contendere*. It fell within the 10-year timeframe. And there is no dispute that the offense was subject to more than one year in prison under Texas law. Thus, the prior conviction satisfied the threshold requirements for admission under clause (a)(1) of the rule. See *People v. Williams*, 173 Ill. 2d 48, 81-82 (1996) (reiterating that prior convictions punishable by more than one year in prison are presumptively admissible, subject to balancing of probative value versus risk of prejudice).

¶ 189   The prior conviction also satisfied the threshold requirements for admission under clause (a)(2). Our cases have held that a prior conviction for (simple, armed, or aggravated) robbery is inherently relevant to testimonial credibility because, in the language of the rule, robbery is a crime that "involve[s] dishonesty." *People v. Courtney*, 186 Ill. App. 3d 25, 29 (1989); *People v. Smith*, 105 Ill. App. 3d 84, 91 (1982); *People v. Dee*, 26 Ill. App. 3d 691, 699 (1975).

¶ 190   Our supreme court has long held that theft, of any kind, is inherently an act of dishonesty and is thus probative of testimonial credibility. *People v. Spates*, 77 Ill. 2d 193, 203-04 (1979). Our cases have extended this rule to robbery, on the ground that robbery, in essence, is a species of theft—a theft committed by the use or threat of force. *Courtney*, 186 Ill. App. 3d at 29; *Smith*, 105 Ill. App. 3d at 91.

¶ 191   Defendant flatly asserts that a robbery conviction has no probative value and is thus irrelevant to a witness's testimonial credibility. But he fails to acknowledge our cases holding otherwise, much less mount a serious argument—or any argument—that they misapply the binding rule of *Spates*. But see *Montgomery*, 47 Ill. 2d at 514 (robbery conviction erroneously

admitted for impeachment, primarily because of its age, but no mention of any inherent relation to credibility). Nor did he make any such argument below, when the trial court properly relied on these precedents. So we will not revisit them today.

¶ 192    The real question is whether the probative value of the prior conviction was substantially outweighed by its risk of unfair prejudice. See Ill. R. Evid. 609(a)(3) (eff. Jan. 1, 2011). The crux of defendant's prejudice argument—at least in his opening brief—is that the trial court permitted the State to elicit testimony about potentially prejudicial details of the prior aggravated robbery, including that defendant helped plan the crime, supplied the gun that was used, and drove his confederates to the scene. But the testimony to this effect, cited in the opening brief, was elicited at the sentencing hearing, not at trial.

¶ 193    In ruling on the motion *in limine*, the trial court recognized that these details would be unduly prejudicial. The trial court thus barred the State from introducing anything beyond the name, date, and punishment for the offense. Contrary to the opening brief's assertion that the trial court allowed the State to ignore that ruling at trial, the State in fact hewed to it closely:

> "Judge, the State would ask to publish defendant's previous conviction for the offense of aggravated robbery. The date of judgment was September 27, 2013. The punishment, or sentence, was ten years' institutional division, sentence of confinement suspended. Defendant placed on community supervision for ten years."

The defense stipulated to these facts, and that was all the jury heard about the prior conviction. The opening brief's argument rests on a misrepresentation of the record and thus merits no further discussion.

¶ 194    Appellate counsels acknowledge their misstatement of the record in the reply brief, where they shift course and offer a fresh round of arguments that the prior conviction posed an undue

risk of prejudice even when presented to the jury, as it was, in bare-bones form. Arguments raised for the first time in a reply brief are forfeited. But regardless, we will briefly explain why we think that the admission of his prior conviction was not an abuse of discretion and, in any event, was highly unlikely to sway the jury's verdict.

¶ 195   There was no way for the jury to avoid the conclusion that defendant was, in general, an unreliable witness. He admitted in his testimony that he lied, under oath, to the grand jury. And his defense was that his confession was likewise untruthful. By his own admission, he lied about Scheau's murder two out of three times. Thus, the question for the jury was not *whether* he was untruthful, but *when* he was untruthful: when he told the detectives one thing, or when he took the stand and told the jury another?

¶ 196   According to our precedents, defendant's aggravated-robbery conviction had *some* relevance to his credibility in general. But given the specific credibility determination that the evidence required the jury to make here, its probative value was surely no more than slight.

¶ 197   But by the same token, its risk of unfair prejudice was also low. It bears emphasis, again, that defendant was admittedly dishonest, not on some remote or unrelated occasion, but when appearing as a sworn witness during the investigation of Scheau's murder. It was this admission, and not defendant's prior conviction, that would undoubtedly drive the jury's assessment of his credibility. There was little risk that the prior conviction might have an outsized impact on that assessment.

¶ 198   Granted, there is always *some* risk of a propensity inference when the jury is presented with the fact of a prior crime. But the risk would have been far more acute if the State had alleged at trial that Scheau was shot during a robbery. See *People v. Atkinson*, 186 Ill. 2d 450, 463 (1999) (risk of propensity inference heightened when prior conviction and charged offense

are same crime). That was not the State's theory; the armed-robbery charges against defendant were dropped before the trial.

¶ 199    We might have reached a different conclusion if the trial court had not excluded details of the prior offense that bore some distracting similarities to Scheau's murder and may well have invited a propensity inference anyway, despite the fact that the charges and theories in the two cases were different. But the trial court recognized the problem here and sensibly excluded those details. And for what it's worth, the trial court gave the appropriate limiting instructions on the permissible use of the prior conviction.

¶ 200    All in all, defendant's prior conviction had no more than slight probative value on the question of his credibility, but it posed only a slight risk of unfair prejudice. Thus, the risk of unfair prejudice did not "substantially outweigh[ ]" its probative value. Ill. R. Evid. 609(a)(3) (eff. Jan. 1, 2011). The evidentiary question was a close one, but the trial court did not abuse its discretion in ruling as it did.

¶ 201    And even if there was error, it was harmless. See *People v. Williams*, 161 Ill. 2d 1, 41-42 (1994) (harmless-error analysis applies to this question). Defendant confessed that he murdered Scheau and admitted that he lied under oath in the course of the investigation that ultimately led to the charges in this case. His prior conviction for an entirely different type of crime, shorn of all prejudicial detail, would have commanded little attention and ultimately received little, if any, weight, during the jury's deliberations. We are confident that the verdict would have been the same, even if defendant's aggravated-robbery conviction had been excluded entirely.

¶ 202                                 CONCLUSION

¶ 203    For these reasons, the judgment of the circuit court is affirmed.

¶ 204    Affirmed.

***People v. Mrdjenovich*, 2023 IL App (1st) 191699**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-0059; the Hon. Marc W. Martin, Judge, presiding. |
| **Attorneys for Appellant:** | Douglas H. Johnson and Joanna P. Kluzowska, of Kathleen T. Zellner & Associates, P.C., of Warrenville, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Daniel Piwowarczyk, and Joseph Alexander, Assistant State's Attorneys, of counsel), for the People. |