2025 IL App (1st) 231195-U

No. 1-23-1195

Third Division
June 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 18 CR 10817 |
| v. | ) | |
| | ) | The Honorable |
| JESUS SILVA, | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |
| | ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1   *Held:* Defendant's conviction and sentence are affirmed, where (1) a rational jury could have found that he was guilty of first degree, not second degree, murder; (2) the trial court did not abuse its discretion in permitting evidence of defendant's prior conviction to be admitted for purposes of impeachment; and (3) defendant's sentence was not excessive.

¶ 2   After a jury trial, defendant Jesus Silva was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) and was sentenced to 60 years in the Illinois Department of Corrections (IDOC). On appeal, defendant contends (1) that his conviction should be reduced to second degree murder, (2) that the trial court erred in permitting evidence of his prior

conviction for armed robbery, and (3) that his sentence was excessive in light of his extensive mental health issues. For the reasons set forth below, we affirm defendant's conviction and sentence.

¶ 3                                    BACKGROUND

¶ 4        On April 11, 2018, defendant shot and killed victim Stephen Ohr during an altercation in Ohr's apartment in Chicago. During the course of the altercation, defendant also shot at Ohr's fiancée, Vanity Walsh, who was uninjured. As a result, defendant was indicted on 45 counts, including 27 counts of first degree murder, two counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)), six counts of armed robbery (*id.* § 18-2(a)), five counts of home invasion (*id.* § 19-6(a)), one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and four counts of residential burglary (*id.* § 19-3(a)). The State, however, ultimately proceeded only on two counts of first degree murder, for the death of Ohr, and one count of attempted first degree murder, for defendant's actions with respect to Walsh.

¶ 5                                *Motion* in Limine

¶ 6        Prior to trial, defendant filed a motion *in limine*, seeking to bar the State from introducing evidence of his prior convictions pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971). Specifically, defendant had previously been convicted in 2010 of one count of home invasion and one count of armed robbery, for which he was sentenced to 12 years in the IDOC. Defendant was paroled on December 14, 2015, and was on parole at the time of the altercation at issue in the instant case.

¶ 7        In considering the matter, the trial court noted that "[t]he question is the unfair prejudice to the defendant." The trial court further observed that if defendant was to testify, his credibility

would be at issue, and determined that it would "mull it over" and rule on the matter at a later time, indicating that "[p]erhaps I may let one of the two come in as opposed to both."

¶ 8        The trial court ultimately ruled on the matter immediately before trial, noting that defendant's convictions were within the 10-year time limit set forth by *Montgomery*, so "[t]he only issue [is], does the prejudicial value outweigh the probative effect." The trial court found that, while any evidence used against a defendant at trial was prejudicial to some extent, "the issue is whether the probative value is substantially affected by the prejudicial effect," and concluded that, if defendant testified, his credibility would be at issue and "the probative value outweighs any prejudicial effect." The trial court, however, allowed the State to introduce only one of the two convictions, giving the defense the choice as to which one it preferred. The defense indicated that it would prefer that any mention of the home invasion be barred, so the trial court ordered that the State would be permitted to introduce a certified copy of defendant's armed robbery conviction.

¶ 9                                                    *Trial*

¶ 10       Defendant's trial was conducted over two days in January 2023. The evidence at trial consisted primarily of testimony from the three surviving individuals who were present at Ohr's apartment at the time of the shooting: Ohr's fiancée, Walsh; Walsh's friend, Alexandria McClanahan; and defendant. Defendant's theory of defense admitted that he had killed Ohr, but claimed that the evidence established that the killing was justifiable as it was done in self-defense or, at most, demonstrated an unreasonable belief in the need for self-defense so as to justify a conviction for second degree murder. With respect to the attempted first degree murder charge, defendant similarly admitted shooting towards Walsh, but contended that he was not aiming for her and shot at her only due to fear for his life.

¶ 11                                     Vanity Walsh

¶ 12        Walsh testified that, on April 10, 2018, she was living in an apartment in Chicago with

Ohr; her friend, McClanahan, was temporarily residing with them, as well. That evening, Ohr

had informed her that "Jessie," whom Walsh identified in court as defendant, was planning on

coming over for dinner and spending the night. Defendant, however, did not arrive until

between 11 p.m. and midnight, while the apartment's occupants were watching movies in the

living room. When defendant arrived, Walsh used the building's buzzer system to let him into

the building, then opened the apartment door for him. She greeted defendant and gave him a

hug, then introduced him to McClanahan. Defendant asked if he could use the restroom, then

indicated that he had left his backpack in his vehicle and needed to retrieve it. Defendant used

the apartment's back door to exit; as he left, Walsh asked him to take out the trash on his way,

which he did. Walsh and Ohr then entered their bedroom, where they were able to observe

defendant walking through the alley from their balcony. They then returned to the living room,

where McClanahan remained.

¶ 13        After approximately five minutes, defendant returned, still without the backpack, and asked

Ohr if they could speak privately. They then went into Ohr's bedroom and closed the door; the

door had a lock which could be unlocked by a keypad on the outside of the door, and Walsh

testified that she believed the door was locked after the two men entered the bedroom. Walsh

and McClanahan remained in the living room, watching movies, and did not hear anything

inside the bedroom.

¶ 14        While they were watching the television, Walsh and McClanahan heard "a really loud noise

a few times," which Walsh described as sounding like "cabinets slamming against the floor";

she estimated she heard four such noises. Walsh and McClanahan "jumped up," and

McClanahan had "sheer terror [on] her face." Walsh decided to investigate, as she "thought they were playing a joke on us." On her way to the bedroom, she stopped in the kitchen to take a knife; McClanahan stayed near the front door. Walsh went to the bedroom door and input the code to unlock the door, then attempted to "shove it open." She, however, struggled to open the door, as it was "blocked" and felt "[l]ike someone was holding the door on the other side."

¶ 15     After three attempts, she was able to open the door, and observed Ohr lying diagonally across the bed, with his back to her and his head near the foot of the bed; he sounded like he was "snoring." She then noticed that defendant was "standing directly in front of me with a gun," which he raised to point at her face. Walsh, who still believed that the men were playing a prank, "asked what was going on." Defendant, who was holding the firearm approximately a foot away from her, then pulled the trigger; the bullet did not hit Walsh, but she felt "[g]unpowder and air." Walsh froze, then defendant pulled the trigger a second time. Walsh "realized it was not a joke" and ran to the bathroom down the hall. As she ran, she observed that the front door to the apartment was open and McClanahan was no longer present.

¶ 16     When Walsh entered the bathroom, she closed the door and stepped back toward the bathtub. Defendant kicked open the door and fired again; Walsh instinctively "kind of dropped to the floor." As she did so, she dropped the kitchen knife she was holding, and defendant fired once more, again missing her. Walsh then began pleading for her life, and defendant indicated that he was not going to kill her but that Ohr "was a bad guy and he was bad to [her]." He then instructed Walsh to remain in the bathroom and left to go into the living room.

¶ 17     Walsh, who was "kind of poking [her] head out," observed defendant enter the living room and take Ohr's phone off of the couch. He then passed by the bathroom, again instructed Walsh to stay inside, and returned to the bedroom, where he emerged holding a small safe which

5

belonged to Ohr and Walsh. When he exited the bedroom, he instructed Walsh "not to say a thing because there were three more people downstairs waiting to finish the job." Walsh pleaded with him to leave, and defendant left through the back door.

¶ 18     After defendant left, Walsh ran to the doors to secure them, then ran to check on Ohr. She called a neighbor and asked him to come help, then called 911. When she reached Ohr, she discovered that what she had believed was snoring was actually his attempt to breathe, as "he had been shot in the face." Walsh rubbed his back and asked if he could hear her; he attempted to respond, but "was choking up blood." Paramedics arrived and carried Ohr out of the apartment, but Walsh was not permitted to accompany him, as she was a witness and needed to speak with police.

¶ 19     The police went through the apartment and, eventually, Walsh was transported to the police station. After some time, she was permitted to leave, but returned to the police station later that afternoon, where she identified defendant from a photo array. Walsh testified that she had met defendant "[a]t least a dozen" times prior to April 10, 2018, and that Ohr had introduced him to her as a childhood friend.

¶ 20     On cross-examination, Walsh testified that Ohr was a "businessman" who owned two auto body shops and a café; she denied that he owned a bar. Walsh further testified that she and Ohr would regularly visit a bar in Milwaukee, Wisconsin, where they often met defendant. On the evening of April 10, 2018, Walsh did not have any communications with defendant before he arrived, and the apartment's occupants had been drinking alcohol before he arrived; Walsh denied that Ohr had used cocaine. From the time that Walsh had heard the loud noises in the bedroom until the time she opened the door, she did not hear any other sounds.

¶ 21 Walsh was also impeached with her previous testimony given before a grand jury, as well as with her statements given to police at the time of the incident, regarding the number of shots defendant had fired at her and defendant's movement through the apartment after she had hidden in the bathroom. Walsh was additionally asked whether there was a weapon in the bedroom on April 10, 2018, and responded "[n]ot to my knowledge." She, however, was impeached by her statement to police at the scene that there was a weapon in the bedside table.

¶ 22                    Alexandria McClanahan

¶ 23 McClanahan testified that, in April 2018, she was a bartender at a local bar owned by Ohr. At the time, her home was undergoing repairs, so she was temporarily living in Ohr and Walsh's apartment with them. On the evening of April 10, 2018, she went to the apartment after work; Ohr had informed her that one of his friends was going to stop by for dinner, and Ohr prepared a taco dinner for the group. Ohr's friend, however, did not arrive until 11 p.m. or midnight, while the apartment's occupants were watching movies. McClanahan had never previously met the friend, who was introduced as "Jessie," prior to that evening; at trial, she identified defendant as Ohr's friend "Jessie."

¶ 24 Defendant spoke to Walsh and Ohr while McClanahan remained on the couch, watching the television. Defendant went to the restroom, after which McClanahan did the same. When McClanahan returned to the living room, Walsh was the only one there, and they continued watching the movie they had previously been watching. After a few minutes, McClanahan asked Walsh where the men had gone, and Walsh paused the movie. While the movie was paused, McClanahan heard three gunshots coming from the bedroom; prior to the gunshots, she had not heard any arguing or other noise from the bedroom. McClanahan and Walsh "froze and stared at each other," trying to determine if it was real or an "elaborate prank," and they

both rose and went to the kitchen to arm themselves with kitchen knives. They began inching down the hallway toward the bedroom, but McClanahan "got a bad feeling in [her] stomach" and stopped at the entrance of the hallway while Walsh continued.

¶ 25     As Walsh went down the hallway, McClanahan asked her to stop, but she did not. When Walsh reached the bedroom door, she input the code to the door's keypad, but "the door would not budge from its frame." McClanahan observed Walsh pushing against the door with her shoulder, and it eventually opened to reveal defendant standing in the doorway. McClanahan watched as defendant raised a firearm in the direction of Walsh's face and fired; McClanahan was able to observe the muzzle flash, which "was close enough to her face to where I saw her hair blow back," and observed Walsh stumble backwards, leading McClanahan to believe "she had just been hit in the face." The knife fell from McClanahan's hand, and defendant fired a shot in her direction, which was the same direction in which Walsh was standing. McClanahan then turned and fled through the front door. She ran back to her apartment building, where her landlord called the police on her behalf since she did not have her cell phone.

¶ 26     McClanahan spoke to officers at the scene, then visited the police station later that same afternoon, where she provided a statement and identified defendant from a photo array.

¶ 27                                   Defendant

¶ 28     Defendant testified that, in April 2018, he was living in an apartment in Milwaukee with his fiancée. In addition to other employment, defendant made money by selling marijuana with Ohr; he would meet Ohr weekly at a nightclub in Milwaukee to drop off Ohr's share of the money. After one such meeting, defendant and Ohr communicated over the phone and arranged for defendant to meet Ohr in person at Ohr's apartment on April 10, 2018. Defendant traveled to Chicago by automobile, and carried "money and a weapon" with him; he explained that he

was doing Ohr a favor by picking up money in Milwaukee and bringing it to him, and that he brought a weapon since he had previously been robbed at gunpoint. Defendant's firearm was loaded, and he carried it in a holster on the waistband. He did not plan to remain in Chicago, but intended to "[d]rop off money, talk for a minute, and get back home."

¶ 29     When defendant arrived in Chicago, he parked his vehicle, walked to the front of Ohr's building, and rang the buzzer. He was allowed into the building, and went upstairs to Ohr's apartment, where he greeted Walsh and Ohr, and was introduced to McClanahan. He then used the restroom. When he returned, he informed Ohr that he had forgotten some of the money in his vehicle, and asked if he could exit through the back door, as that was closer to where he had parked. Ohr asked him to take out some trash on the way, which he did. Defendant returned to the vehicle, retrieved the money, and moved his vehicle to a different location so that it would not be ticketed or towed.

¶ 30     When he returned to the apartment, he told Ohr, "let's take care of this," and the two went into Ohr's bedroom. Defendant characterized Ohr's demeanor as "fidgety, a little aggressive," and speculated that "he was off [*sic*] something at that time." In the bedroom, Ohr began counting the money defendant had brought and separating it. Defendant observed Ohr place some of the money in his pocket, then defendant told Ohr that "I'll pay you the rest that I owe you," which was approximately $1,360, and that "I don't want to sell no more." Ohr gave defendant a "mean look" and said, "it doesn't sound right," which defendant interpreted as Ohr being suspicious that defendant was talking to the police, which was untrue. Defendant reassured him that he was not talking to the police, and Ohr walked into the bedroom closet, emerging with a handgun.

¶ 31      Ohr sat on the edge of the bed with the handgun in his lap, resting his hand on the weapon. Defendant's "heart started pounding fast and I felt scared." Ohr again said that "it doesn't sound right," and defendant again attempted to reassure him, but Ohr "[m]oved toward [him] aggressively," standing up from the bed. Defendant quickly pushed Ohr by the shoulder, and Ohr fell back against the bed, where he bounced and "popped up real fast," at which point defendant pulled out his firearm and fired a shot, hitting Ohr in the face. Ohr swore and reached for his firearm, and defendant moved to the side, firing again; he could not recall firing a third shot. He ended up standing on one side of the room while Ohr remained on the bed; defendant testified that he "sounded like he was snoring."

¶ 32      Defendant was standing in place, with his "heart *** beating fast," when the door opened and Walsh walked in, holding a knife in her hand, and asked what had happened. He told her that "your man tried to kill me" and pointed his handgun at the floor. Walsh "came right at [him]," and he ran into a piece of furniture in the bedroom as he was "dodging her stabbing [him]." He then raised his weapon and fired in her direction. She ducked, and he told her to get away from him, so she turned and ran from the bedroom.

¶ 33      Defendant left the bedroom and attempted to leave the apartment through the rear exit, but Walsh "almost stabbed" him in the hallway near the bathroom. He raised his weapon, backed her into the bathroom, and told her to drop the knife. She refused to do so, so he fired two shots in her direction and told her again to drop the knife, which she did. He then returned to the bedroom to retrieve the money, left through the rear exit, and returned to his vehicle, where he drove back home to Milwaukee.

¶ 34      On cross-examination, defendant testified that when he pushed Ohr, Ohr dropped his handgun to the floor. He further testified that, after Ohr had been shot the first time, Ohr

attempted to reach for the handgun on the floor. Defendant also denied holding the bedroom door shut when Walsh attempted to enter.

¶ 35    Defendant admitted that, when he was initially questioned by officers, he denied going to Chicago, denied being in Ohr's apartment, and denied shooting Ohr. Defendant, however, claimed that he did so as "[he] was scared. [He] didn't want to [get in] any trouble."

¶ 36                                    Other Witnesses

¶ 37    In addition to the three individuals present at the scene, a variety of additional witnesses provided testimony as to the forensic and medical aspects of the altercation.

¶ 38    Officer Kimball Suen, who was an evidence technician on the case, testified that he and his partner videotaped and photographed the crime scene and marked the relevant evidence. He identified photographs of four fired cartridge cases, two fired bullets, and a live round recovered from the bedroom, a handgun recovered from the bedroom drawer, and a fired cartridge case recovered from the bathroom. He further testified that only one knife was recovered from the scene, and that there was no observed damage to the bathroom door.

¶ 39    Sergeant Christopher Doherty, who was assigned to investigate the incident, testified that he and his partner arrived at the scene at approximately 1:10 a.m., where multiple officers, as well as Walsh and McClanahan, were already present. He spoke with Walsh, who provided the name of the offender as "Jessie," which eventually led to defendant. Walsh also informed him that there was a firearm in a nightstand drawer, and Doherty testified that the weapon was located underneath some personal items in the drawer and did not have a magazine inside it. Doherty additionally testified that, after Walsh and McClanahan had identified defendant from photo arrays, defendant was arrested at his home in Milwaukee on April 19, 2018. Upon

searching his residence, police recovered a black hooded jacket with gray sleeves, which was similar to that worn by the offender during the incident, as well as a loaded firearm.

¶ 40    Dr. Michael Eckhardt, an assistant medical examiner, testified that he performed an autopsy of Ohr after his death. Eckhardt testified that Ohr had three "perforating gunshot wounds to his head," all of which were located on his face near his nose, and would have been made from 6 to 30 inches away based on the presence of stippling, with the distance likely being closer to the far end of the range. Ohr also had ethanol and cocaine in his system at the time of his death, with the level of ethanol being equivalent to a blood alcohol content of 0.016 and the level of cocaine being approximately 11 times the level needed to be detectable on the report.

¶ 41    Dustin Johnson, a forensic scientist with the Illinois State Police specializing in firearms identification, testified that he received five fired cartridge cases, two fired bullets, two firearms, one magazine, seven unfired cartridges, and one holster to analyze with respect to the instant case. One of the firearms, which had previously been identified as the firearm recovered from Ohr's bedroom, was inoperable when received, as it was missing the recoil spring assembly. The other firearm, however, which had previously been identified as the firearm recovered from defendant's apartment in Milwaukee, was the firearm which had fired four of the fired cartridge cases and the two fired bullets; the fifth fired cartridge was inconclusive.

¶ 42                                Verdict

¶ 43    After deliberations, the jury found defendant guilty of first degree murder with respect to Ohr, but not guilty of attempted first degree murder with respect to Walsh. Defendant subsequently filed a posttrial motion for new trial, which was denied.

¶ 44                                     *Sentencing*

¶ 45        The matter came before the trial court for sentencing, at which the State presented victim impact statements from Ohr's sister and the mother of his child in aggravation. In mitigation, defendant provided a statement in allocution, expressing remorse for Ohr's death and asking for forgiveness, but maintaining that he had been acting in self-defense.

¶ 46        A presentence investigation report (PSI) indicated that defendant was a 38-year-old male who reported being raised by his grandmother in Milwaukee after being removed from the home of his mother and stepfather, where he had been abused. He was a below-average student in school, and was enrolled in special education classes for "learning issues and emotional distress" throughout most of his schooling; he left school in ninth grade due to "abuse and problems in his personal life." He had one 16-year-old son, who was in the custody of defendant's sister, and his girlfriend had two children, who he referred to as his "stepchildren."

¶ 47        Defendant reported that he had received mental health treatment since grade school, and had been admitted to a mental hospital in 2017 for several days "due to suicidal thoughts and depression." He further reported that he had been diagnosed with "ADHD, bipolar depression, PTSD, and schizophrenia," but that he "never underwent a BCX exam."

¶ 48        Finally, the PSI indicated that defendant's prior criminal record consisted of the 2010 convictions for home invasion and armed robbery in Cook County, for which he was sentenced to 12 years in the IDOC, as well as a 2003 conviction for operating a vehicle without consent in Milwaukee County.

¶ 49        After considering the evidence in aggravation and mitigation, as well as the arguments of the parties, the trial court imposed a sentence of 60 years in the IDOC. The trial court noted that the evidence at trial demonstrated that Ohr

"was shot like [defendant] was a marksman. Within three inches he was shot in the face, like, with the nose part of his face. Three shots in that two-and-a-half inch space. That's pretty good for a moving target according to him. That's someone who's not moving around much to get hit like that. At least two of the shots were within about a three-inch space, right near his nose. Hard to hit a guy like that if he's moving around."

The trial court further indicated that it had "read the PSI at length," and went through the various information contained therein.

¶ 50    The trial court found:

"The range for [the] sentence of [defendant], murder with a firearm, is 45 years. That's the minimum you could possibly walk out of here with, but the man has done a 12-year bid before. It wasn't like [a] juvenile, it wasn't like a young guy. This is an unprovoked, straight-out murder. No other way to put it. Plus, the man has done 12 years before for an armed robbery, and according to the State, I don't recall for sure, I'll take the State's word for it, on parole at the time. If anyone should know better about having a gun, it's [defendant]. If anybody should know not to carry a gun [from] one state to another it's [defendant]. If anybody should know don't kill that guy, [defendant] would know that, too."

Consequently, the trial court sentenced defendant to 60 years in the IDOC.

¶ 51    Defendant filed a motion to reconsider his sentence, which was denied, and this appeal follows.

¶ 52                                                    ANALYSIS

¶ 53    On appeal, defendant contends (1) that his conviction should be reduced to second degree murder, (2) that the trial court erred in permitting evidence of his prior conviction for armed

14

robbery, and (3) that his sentence was excessive in light of his extensive mental health issues. We consider each argument in turn.

¶ 54                                    *Second Degree Murder*

¶ 55        Defendant first contends that his conviction should be reduced to second degree murder where Ohr's death was the result of defendant's belief—albeit unreasonable—that he needed to use deadly force to protect himself against Ohr. When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *Smith*, 185 Ill. 2d at 541).

¶ 56        In this case, defendant contends that the jury erred in finding him guilty of first degree murder instead of second degree murder. In order for a defendant to be found guilty of second degree murder, the State must first prove all of the elements of first degree murder beyond a

reasonable doubt. 720 ILCS 5/9-2(a) (West 2018); *People v. Jeffries*, 164 Ill. 2d 104, 118 (1995). In addition, where, as here, the defendant raises an affirmative defense of self-defense, the State bears the burden of disproving the elements of that defense beyond a reasonable doubt. 720 ILCS 5/9-2(c) (West 2018); *Jeffries*, 164 Ill. 2d at 127.

¶ 57        To raise a claim of self-defense, the defendant must present some evidence that (1) force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the defendant actually and subjectively believed a danger existed which required the use of the force applied, and (6) his beliefs were objectively reasonable. *Jeffries*, 164 Ill. 2d at 127-28; *People v. Scott*, 2015 IL App (1st) 131503, ¶ 32. If the State negates any of the elements required for such a defense, the defendant's claim of self-defense fails. *Jeffries*, 164 Ill. 2d at 128. In that case, the jury must determine whether the defendant is guilty of first degree or second degree murder. *Id.*

¶ 58        In order for the offense of first degree murder to be mitigated to second degree murder, the defendant has the burden of proving the applicability of one of the statutory mitigating circumstances by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2018); *Jeffries*, 164 Ill. 2d at 118. As relevant to the case at bar, one such mitigating circumstance is where the defendant establishes that, at the time of the killing, he believed that the circumstances justified the use of self-defense, but that belief was unreasonable. 720 ILCS 5/9-2(a)(2) (West 2018); *People v. Hawkins*, 296 Ill. App. 3d 830, 836 (1998). In other words, the defendant must prove all of the elements applicable to a self-defense claim, apart from the element concerning the reasonableness of his belief in the need for self-defense, by a preponderance of the evidence. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 149. This form of second degree murder is

often referred to as "imperfect self-defense." *Jeffries*, 164 Ill. 2d at 113; *Castellano*, 2015 IL App (1st) 133874, ¶ 148.

¶ 59    In this case, defendant does not dispute that the State established all of the elements of first degree murder, nor does he challenge the jury's finding that he was not acting in self-defense. Instead, defendant contends that his account of the events in Ohr's bedroom was the only testimony from a witness who was actually in the room at the time of the shooting and that his testimony established that he was in fear for his life when he shot Ohr. Thus, even if the jury could have properly found that his belief was unreasonable, defendant maintains that he proved imperfect self-defense by a preponderance of the evidence. We do not find this argument persuasive.

¶ 60    Defendant's argument on appeal is premised entirely on his contention that the jury was required to credit his trial testimony. As noted, a reviewing court will not substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *Jackson*, 232 Ill. 2d at 281. Our supreme court, however, has long held that, "[w]here the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded even by a jury." *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981) (citing *Larson v. Glos*, 235 Ill. 584, 587 (1908)); *People v. Washington*, 2023 IL 127952, ¶ 56. Accordingly, defendant claims that the jury was not free to disregard his testimony in this case.

¶ 61    Defendant, however, fails to recognize that his testimony is not the kind which falls within this description. First, defendant's testimony as to the events of the evening was contradicted at least in part, both by testimony and by physical evidence. For instance, while defendant

testified that he was standing between the bed and the television when Walsh entered the bedroom, both Walsh and McClanahan testified that Walsh struggled to open the bedroom door and that, when she did, defendant was immediately in front of her, holding a firearm. Walsh described her struggles as feeling "[l]ike someone was holding the door on the other side." Similarly, after Walsh opened the bedroom door, defendant testified that Walsh lunged at him with a knife, which was inconsistent with Walsh's and McClanahan's testimonies that defendant immediately fired his weapon at Walsh. While defendant points to the fact that the jury ultimately acquitted him on the attempted murder charge, which he interprets as an indication that the jury disbelieved Walsh's testimony, the fact remains that there was testimony presented at trial which contradicted defendant's testimony.[1]

¶ 62    Defendant's testimony was also contradicted at least in part by physical evidence. Defendant testified that Ohr retrieved a handgun from the closet and was holding it in his lap while speaking with defendant. The only firearm, however, which was recovered from the bedroom was a handgun which was inside the drawer of the bedside table, underneath personal items. Similarly, defendant testified that he shot Ohr when Ohr was sitting on the side of the bed, but the evidence established that Ohr's body was lying diagonally across the bed, with his head at the foot of the bed farthest away from where defendant testified that he was sitting.

¶ 63    We additionally observe that defendant's testimony was impeached. While he admitted at trial to shooting Ohr, the State introduced evidence of defendant's initial interview with police, in which he denied even being in Ohr's apartment, much less shooting him, going so far as to express apparent surprise at learning of Ohr's death. Accordingly, we cannot find that the jury

---

[1] We also observe that defendant's theory as to why he was acquitted of the attempted murder charge is speculation, as there is no indication in the record as to the jury's reasoning on that count.

was required to credit defendant's testimony simply due to the fact that he was the only witness to the events which occurred inside the bedroom.

¶ 64    Defendant's suggestion that the jury was required to credit his testimony where his testimony was not contradicted or impeached *as to the precise course of events inside the bedroom* is without merit. First, we observe that his testimony on that point *was* arguably contradicted to some extent by the physical evidence, as explained above. More importantly, as the factfinder, a jury's assessment of a witness' credibility is normally afforded great deference, as it has the opportunity to hear the testimony and observe the witness and his demeanor. See *People v. Frazier*, 248 Ill. App. 3d 6, 13 (1993). This deference has limits, as we have explained, and is not boundless. Defendant, however, provides no authority for the proposition that a jury is required to credit each statement made by a witness so long as *that particular statement* has not been affirmatively contradicted or impeached, and we cannot agree with defendant's position. Such an interpretation of the law would eviscerate any ability of the jury to draw conclusions as to a witness' credibility based on broader considerations, such as its own observations as to the witness' demeanor or the veracity of his testimony as a whole. Accordingly, we find no merit to defendant's contention that the jury was required to credit his testimony and, consequently, defendant's reliance on *People v. Hawkins*, 296 Ill. App. 3d 830 (1998), in support of his claims on appeal is unavailing.

¶ 65    In this case, a rational jury could have determined that defendant failed to prove that he had a belief in the need for self-defense. The undisputed evidence at trial established that defendant traveled to Chicago from Milwaukee while armed with a loaded handgun. After going into Ohr's bedroom with him, defendant shot Ohr three times in the face, all in the same general area near the nose. When Walsh entered the bedroom after hearing the gunshots,

19

defendant shot at her several times, ultimately leaving the apartment and traveling back to Milwaukee.

¶ 66    Additionally, taking the facts in the light most favorable to the State, the evidence further established that Ohr, while having cocaine in his system, was not acting unusually during the course of the evening, preparing a taco dinner and watching movies with Walsh and McClanahan. When Ohr and defendant went into the bedroom, there were no sounds coming from the bedroom which could be heard by Walsh and McClanahan, until the sound of gunshots. These additional facts could reasonably suggest that Ohr was not the aggressor, and that there was no altercation which preceded the shooting which would necessitate a response of deadly force.

¶ 67    In sum, the jury was not required to credit defendant's account of the events leading up to the shooting of Ohr, and there was evidence which could support a rational jury's determination that defendant did not have even an unreasonable belief in the need for self-defense. Accordingly, we cannot find that defendant's first degree murder conviction must be reduced to second degree murder.

¶ 68                                          *Prior Conviction*

¶ 69    Defendant next contends that the trial court erred in permitting the State to introduce evidence of his prior conviction for armed robbery. Pursuant to our supreme court's decision in *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971), evidence of a witness' prior conviction is admissible as impeachment evidence to attack the witness' credibility where (1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statements, regardless of the punishment; and (2) no more than 10 years has elapsed since the date of conviction or the release of the witness from imprisonment, whichever is later;

unless (3) the probative value of admitting the prior conviction is "substantially outweighed" by the danger of unfair prejudice. See also *People v. Atkinson*, 186 Ill. 2d 450, 456 (1999) (reciting the *Montgomery* factors). The *Montgomery* factors have been codified in the Illinois Rules of Evidence. See Ill. R. Evid. 609 (eff. Jan. 1, 2011).

¶ 70 In conducting the balancing test required by *Montgomery*, the trial court is to consider, among other things, the nature of the prior conviction, its recency and similarity to the charge at issue, other circumstances surrounding the prior conviction, and the length of the witness' criminal record. *Atkinson*, 186 Ill. 2d at 456. The trial court's determination of whether a witness' prior conviction is admissible for impeachment purposes is within the discretion of the trial court. *Id.*

¶ 71 In this case, the trial court permitted the State to introduce evidence of defendant's 2010 conviction for armed robbery. On appeal, defendant raises two challenges to the introduction of this evidence. Defendant first contends that the trial court abused its discretion in admitting the conviction where "the trial court failed to apply the proper legal standard set forth in [*Montgomery*]." Specifically, defendant claims that the trial court failed to conduct the balancing test required by *Montgomery* and instead merely considered whether admission of the conviction would have any prejudicial effect. We do not find this argument persuasive.

¶ 72 A trial judge is presumed to know the law, and we will presume that the trial judge followed the law unless the record indicates otherwise. *People v. Groel*, 2012 IL App (3d) 090595, ¶ 43; see also *People v. Alexander*, 2024 IL App (3d) 210575-U, ¶ 38 (presuming that the trial court conducted the *Montgomery* balancing test). Here, the trial court's comments made clear that it was aware of the appropriate test to apply, despite defendant's contentions to the contrary. The trial court's consideration of the matter encompassed two court dates, as the trial court

21

indicated that it was going to "mull it over" after the parties presented their initial arguments; ultimately, the trial court ruled directly before trial that the evidence of the armed robbery would be permitted. While the trial court, on occasion, referenced "prejudice" instead of "unfair prejudice," this in no way suggests that the trial court applied the incorrect standard in ruling on the admissibility of defendant's prior conviction. See *People v. Williams*, 173 Ill. 2d 48, 83 (1996) (declining to find error where the trial court applied the *Montgomery* standard, even though it was not expressly articulated); see also *Atkinson*, 186 Ill. 2d at 462-63 (finding the trial court was aware of the balancing test where it commented that the relevant question was " 'whether the prejudice outweighs any probative value' ").

¶ 73        We similarly find unpersuasive defendant's reliance on the fact that the trial court observed that "any evidence in a criminal case offered by the State against the defendant is prejudicial." This observation merely reflects a basic legal truism. See, *e.g.*, *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25 ("Of course, all evidence is prejudicial in that it is intended to impact the fact finder's decision. Why would anyone put on evidence at trial that did not prejudice the opponent's case?"). Indeed, to the extent that the trial court's observation has any relevance, it operates to undercut defendant's argument on appeal. In a troubling omission, in his brief on appeal, defendant cuts short the trial court's comment the second time it made reference to this legal truism. The full comment, from the record on appeal, is as follows: "[A]ny evidence used against a person in trial is prejudicial to some extent or another *and the issue is whether the probative value is substantially affected* [*sic*] *by the prejudicial effect*." (Emphasis added.) The portion of the comment which was omitted by defendant in his brief thus makes clear that the trial court was aware of the balancing requirement of the *Montgomery* standard. We therefore find no merit to his contention that the trial court applied the incorrect standard.

¶ 74        Defendant's second argument concerning the admission of his prior conviction for armed robbery, namely, that the conviction was inadmissible under *Montgomery*, similarly lacks merit. Defendant claims that the probative value of his prior conviction was substantially outweighed by the danger of unfair prejudice. Specifically, defendant contends that the nature of his prior conviction had little bearing on the issue of his honesty and veracity and instead increased the danger that the jury would have considered it as an indicator of his propensity to commit violent offenses. Despite defendant's contention to the contrary, several courts have held that a prior conviction for robbery—including armed robbery—is a crime which is "inherently relevant to testimonial credibility because, in the language of the rule, robbery is a crime that 'involve[s] dishonesty.' " *People v. Mrdjenovich*, 2023 IL App (1st) 191699, ¶ 189 (quoting *People v. Courtney*, 186 Ill. App. 3d 25, 29 (1989)); see also *People v. Smith*, 105 Ill. App. 3d 84, 91 (1982); *People v. Dee*, 26 Ill. App. 3d 691, 699 (1975). Additionally, even if it was not, *Montgomery* does not restrict evidence of prior convictions to only those offenses which involve crimes of dishonesty. See *Williams*, 173 Ill. 2d at 82-83. We also cannot agree that the nature of the prior conviction bears similarity to the charged offenses, so as to improperly influence the jury. Accordingly, we cannot find that the trial court abused its discretion in permitting the admission of defendant's prior conviction pursuant to *Montgomery*.

¶ 75                                    *Sentencing*

¶ 76        The final issue raised by defendant on appeal is a challenge to his 60-year sentence. Defendant contends that his sentence is excessive, in light of his extensive mental health issues. We note that, in the heading to this section of his brief, defendant also contends that the sentence was excessive "in light of the nature of the offense and [his] extensive mental health issues." Defendant, however, makes no argument concerning the nature of the offense and we

therefore have no need to address the issue further. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***.").

¶ 77     While the legislature has prescribed the permissible range of sentences, the trial court retains a great deal of discretion in fashioning an appropriate sentence within the statutory limits. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* A reviewing court gives "great deference" to the trial court's judgment regarding sentencing, as the trial court has the best opportunity to consider these factors, having observed the defendant and the proceedings. *Id.*

¶ 78     In reviewing the propriety of a sentence, the reviewing court may not substitute its judgment for that of the trial court merely where it would have weighed the factors differently. *Id.* Instead, "[a] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Id.* at 54 (citing *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987)).

¶ 79     In this case, the sentencing range for first degree murder was 20 to 60 years (730 ILCS 5/5-4.5-20(a) (West 2018)), with a mandatory 25-year enhancement for discharging a firearm which caused the death of another person during the commission of the offense (*id.* § 5-8-1(d)(iii) (West 2018)). Thus, defendant faced a possible sentence of 45 to 85 years. The trial court, after considering evidence in aggravation and mitigation, sentenced him to 60 years. We cannot find that this sentence was excessive or otherwise represented an abuse of the trial court's discretion.

¶ 80      Defendant contends that the trial court failed to properly consider his "traumatic upbringing and his mental health issues" when determining his sentence. While defendant acknowledges that the trial court referenced these issues during sentencing, he nevertheless claims that the trial court afforded them inadequate weight. We cannot agree. Defendant's position requires us to reweigh the sentencing factors, which we are not permitted to do on appeal. See *Fern*, 189 Ill. 2d at 53. Here, the trial court was presented with all of the evidence, including the information contained in defendant's PSI, and indicated that it had considered it in rendering its decision. The trial court nevertheless clearly gave the most weight to other factors, which it was permitted to do. The trial court noted that defendant shot Ohr three times, with all three of the shots hitting Ohr in the same general area near his nose, which suggested that Ohr had not been moving at the time of the shooting. The trial court also noted that defendant had come from Milwaukee with a loaded firearm, and returned home immediately after the shooting. It dismissed defendant's self-defense claim as "nowheresville," and found that the killing was an "unprovoked, straight-out murder." The trial court also observed that defendant "wasn't like a young guy," and had served 12 years in the IDOC for his prior convictions. We cannot find any error in the trial court's determination that a 60-year sentence in this case was appropriate, despite defendant's reported history of mental health issues and his troubled upbringing.

¶ 81                                CONCLUSION

¶ 82      For the reasons set forth above, we affirm defendant's conviction and sentence. First, defendant was properly convicted of first degree murder, where a rational jury could have found that he failed to prove circumstances which mitigated the offense to second degree murder. Second, the trial court did not abuse its discretion in permitting the State to introduce

evidence of his prior conviction for impeachment purposes. Finally, defendant's 60-year sentence was not excessive.

¶ 83        Affirmed.